## SNAKE RIVER LAND CO. ET AL. v. UTAH-IDAHO SUGAR COMPANY

(No. 2208; January 5, 1942; 120 Pac. (2d) 601)

426

428

For the apellant there was a brief by *John U. Loomis* of Cheyenne, Wyoming, *Ashby D. Boyle* of Salt Lake City, Utah, and *Otto E McCutcheon* of Idaho Falls, Idaho, and oral argument of *Mr. Loomis.*

430

For the respondent, there was a brief by *Ewing T. Kerr,* Attorney General; *Harold I. Bacheller,* Deputy Attorney General; and *Arthur Kline,* Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Kerr.*

For the protestant and respondent, there was a brief by *Fabian, Clendenin, Moffat & Mabey* of Salt Lake City, Utah, and *Arthur Kline* of Cheyenne, Wyoming, and oral argument by *Mr. Moffat.*

RINER, Chief Justice.

This cause is before the court by direct appeal from a judgment of the district court of Teton County, which "confirmed" a decision of the State Board of Control, which theretofore, on appeal from certain orders, made by him, sustained the action of the State Engineer of this State regarding the proposed amendment of several reservoir permits, and as to other matters pending before him. The Utah-Idaho Sugar Company was the applicant for the amendment of these permits and the appealing party throughout this litigation. The Snake River Land Company filed a protest before the State Engineer against the applications of the Utah-Idaho Sugar Company and is designated as the "protestant and respondent". The State Board of Control is also named herein as a respondent.

For convenience and brevity the Utah-Idaho Sugar Company, which is a Utah corporation authorized to transact business in Idaho and Wyoming and certain other states, will subsequently be mentioned as the "appellant" or the "Utah Company"; the respondent, the State Board of Control, will usually be herein referred to as the "Board"; and the Snake River Land Company, also a Utah corporation with authority to do business in the State of Wyoming, will be designated as the "Land Company".

Subject to the condition of the record on the instant appeal, which will hereinafter be discussed, the facts which we deem material to be borne in mind so far as the merits of this proceeding are concerned, would appear to be these:

There are, or rather, were, for one of them has ceased to exist, two corporations, each bearing the name "Osgood Land & Livestock Company". One of

these corporations exists through and under authority granted by the State of Idaho, while the other was created under Wyoming law. The relation existing between these two corporate entities is not very clearly defined in the record aforesaid. Unless otherwise indicated in the subsequent discussion, the Wyoming corporation of this name will be intended, and for brevity it will be referred to as the "Osgood Company".

This litigation undertakes to draw in question the use of two reservoirs constructed upon Two Ocean and Emma Matilda Lakes, which are bodies of water located in Teton County, Wyoming, and upon lands owned and controlled by the United States government. It also involves the use of certain water channels, viz., Two Ocean Creek, which carries the run-off from Two Ocean Lake into Pacific Creek, and Emma Matilda Creek, which performs a like service for Emma Matilda Lake. Pacific Creek is a tributary of the Snake River in said County, and these water channels are for the most part on land owned and controlled by the United States of America.

In the year 1919 Joseph Markham and Roy Lozier filed in the office of the State Engineer of the State of Wyoming an application for Permit No. 3561-Res., proposing to build a dam three feet high near the outlet of Emma Matilda Lake and to store 2579.7 acre feet of water. This permit was granted and final proof made. A secondary permit No. 15569 was also given to these parties, together with another person, for the beneficial application of this stored water to 386.5 acres of land in Teton County, Wyoming. The reservoir permit was adjudicated for 1710 acre feet capacity and the secondary permit aforesaid for the irrigation of the land mentioned therein.

The same year H. C. McKinstry and William C. Thompson filed in said office an application for Permit No. 3487-Res., proposing to construct a dam two feet

high near the outlet of Two Ocean Lake and to store 1024 acre feet of water. This permit was also granted and final proof made. Secondary Permits Nos. 15185 and 15186 issued for the beneficial use of this stored water on 246.6 acres in Teton County, Wyoming. The Reservoir Permit was adjudicated for 512 acre feet capacity and said secondary Permits for the irrigation of the lands therein described.

The forestry service of the United States government, apparently in direct charge of these lands, seems to have assented to the construction of these small dams designed to furnish water for the use of certain ranches in Teton County, Wyoming. These dams were subsequently raised somewhat in height by successors to the original applicants, the Two Ocean Reservoir Dam to six feet and the Emma Matilda Dam to four feet. The Utah Company claims some interest in these reservoirs through certain deeds and assignments, as does the Land Company as purchaser of much of the ranch lands, to which water was adjudicated under the secondary permits aforesaid. None of these rights appear to be directly involved in the case at bar and they are briefly described now merely to show the condition of affairs existing at the time of the applications for the permits here in question and to throw some light on the interests of the respective parties hereto at that time.

Subsequently and on October 6, 1919, one C. C. Carlisle filed applications in the office of the State Engineer of this State to construct water impounding works, which would very greatly enlarge the capacity of the reservoirs aforesaid by undertaking to enlarge the Two Ocean Reservoir to an available capacity of 63,605 and the Emma Matilda Reservoir to 60,900 acre feet. Application was also made for a water supply canal to these reservoirs from Pacific Creek by the construction of the Twin Reservoir Supply Canal. These applica-

tions were thereafter granted by the State Engineer of Wyoming on September 14, 1921, as Permits Nos. 3770-Res. and 3771-Res. for the enlargement of the Two Ocean and Emma Matilda Reservoirs respectively, Permit No. 16190 for the Twin Reservoir Supply Canal and Permit No. 4232 Enl. for the enlargement of this canal.

In this connection it may be observed that the aforesaid application No. 3770 Res. stated that the "reservoir is located in the channel of Two Ocean Creek", and the application No. 3771-Res. sets forth that this reservoir "is located in the channel of Emma Matilda Creek". By original application or by assignment these permits were eventually held by the Osgood Company. All four of these permits referred to in the preceding paragraph were conditionally granted, as the endorsements made thereon by the State Engineer in his official capacity disclose:

"This permit is conditioned upon the strict performance by the permittees, or their successors or assigns, of the certain agreement dated May 2, 1921, between Frank C. Emerson, State Engineer, and The Osgood Land and Livestock Company, and *is subject to cancellation at any time the terms of said agreement are not complied with.*

"This permit grants only the right to use surplus water of the stream when all prior rights are satisfied.

"Construction of proposed work shall begin within one year from the date of approval.

"The time for completing the work shall terminate on December 31, 1924.

"The time for completing the application of water to beneficial use shall terminate on December 31, 1924, and final proof of appropriation shall be made within five years thereafter."

We have italicized the particular portion of these endorsements which is especially pertinent in the case now before us.

The lands which were proposed to be affected by the

enlargement of these reservoirs, and also the land through which the supply canal was to be built, are, as hereinabove generally indicated, Federal domain property, under the ownership, control and supervision of the United States government. They were temporarily withdrawn from settlement, location, sale or entry by Executive Order of the President, No. 2905, dated July 8, 1918. This order was supplemented and extended by a second withdrawal of these lands under date of January 28, 1921, Executive Order No. 3394, dated January 28, 1921.

Due to these several withdrawal orders and the prospective difficulty of obtaining rights-of-way for the proposed constructions and their consequences, a written agreement was entered into under date of May 2, 1921, by and between the then State Engineer of this State, Frank C. Emerson, as such Engineer, and also as a "trustee for and in behalf of the State of Wyoming", as party of the first part, and the Osgood Company aforesaid, as party of the second part, wherein, after setting forth certain recitals, it was agreed by and between the respective parties as follows:

"I.

"The party of the first part, does hereby agree that upon the execution of this Agreement, and the delivery of the necessary Surety bond or bonds, that he will duly approve the applications now pending in his office covering the granting of permits for the construction of the said reservoirs and supply ditches, together with the necessary water appropriation required for said reservoirs, and that he will issue the necessary permits in connection with the said applications, authorizing and permitting the said second party to construct the aforesaid reservoirs and divert the waters from the streams available, and particularly from Pacific Creek, to be stored in said reservoirs.

II.

"The said party of the second part agrees that upon the issuance of the aforesaid permits, it will make due

and proper application to the General Land Office of the United States for the purpose of securing the necessary rights-of-way for the construction of the reservoirs and supply ditches contemplated in the aforesaid applications, and that it will use all due diligence in securing the said rights-of-way.

### III.

"The said party of the second part agrees that upon the said United States General Land Office granting to the second party the necessary rights-of-way, permitting the said second party to construct the aforesaid reservoirs and supply ditches, that the said second party, its successors and assigns, will pay the party of the first part, as Trustee for said purpose, the sum of thirty thousand dollars ($30,000.00), the same to be used,—one-half in connection with the building of a bridge across Snake River at or near Wilson, in Jackson Hole, Wyoming, and one-half to be used in connection with construction of bridges across Snake River at or near Menor's Ferry, Jackson Hole, Wyoming, which said sum the said second party agrees to pay as follows, to-wit:

$15,000.00 at the time the said rights-of-way are granted to the second party by the said United States General Land Office, and $7,500.00 within twelve (12) months thereafter, and the remaining $7,500.00 within eighteen (18) months thereafter.

### IV.

"The said party of the second part agrees to furnish Surety bond or bonds, guaranteeing to the party of the first part, the performance of the acts herein provided to be performed by the said second party, which said bond or bonds, it is hereby mutually agreed, shall be correspondingly reduced as the respective payments are from time to time made.

### V.

"It is finally agreed and understood between the parties hereto, that in the event of the United States General Land Office refusing to grant the necessary rights-of-way, required in the construction of the said

reservoirs and supply ditches, that then this agreement shall become null and void upon the said party of the second part surrendering and delivering to the party of the first part, for cancellation, the said permits to be issued by him, and which are covered by this agreement."

Attached to this agreement appears to be a written "stipulation" stating:

"The understanding of parties signed hereto is that, if certain bonds are executed by the Osgood Land and Livestock Company of Wyoming and delivered to the State Engineer of Wyoming, and other terms and conditions of this agreement are complied with, the certain reservoir applications for the storage of water at Emma Matilda and Two Ocean Lakes and Pacific Creek will be approved by the State Engineer of Wyoming.

"The aforesaid bonds shall be in favor of Frank C. Emerson, State Engineer, as trustee for the State of Wyoming, and are designed for the purpose of providing funds to assist in constructing two certain bridges across the Snake River, the necessity for which in part arises from the release of water stored in reservoirs on the Upper Snake River. One of the aforesaid bonds shall provide for the payment of Fifteen Thousand Dollars ($15,000.00), in cash, to the Trustee, upon the approval of the necessary rights-of-way by the Federal Government for the proposed Emma Matilda Lake and Two Ocean Lake Reservoirs, the said amount to be used by the State toward the construction of the new bridge near Wilson. A second bond shall provide for the payment of Seventy-five Hundred Dollars ($7,500), in cash, to the Trustee, within twelve (12) months after the said rights-of-way are granted by the Federal Government, and an additional Seventy-five Hundred Dollars ($7,500), within eighteen (18) months after the granting of the said rights-of-way. The bonds shall be surety company bonds, and shall be approved as to form by the Attorney General of Wyoming.

"The granting of the said reservoir applications is further conditioned upon the assignment by C. C. Carlisle to the Osgood Land and Livestock Company of Wyoming of any permits that may be issued in his name. The proposed action of approval upon the said applications by the State Engineer shall be taken as

soon as the aforesaid bonds and assignments are received in his office.''

This stipulation, undated, was signed by Frank C. Emerson, State Engineer, C. C. Carlisle, and one O. A. Johannesen, the attorney for the Osgood Company and designated as such in one of the recitals preceding said agreement of May 2, 1921. The original agreement of that date was signed by Frank C. Emerson, "State Engineer of Wyoming and Trustee as hereinabove stated", and the "Osgood Land and Livestock Company" by its president and secretary.

Pursuant to this agreement and stipulation the Osgood Company seems to have tendered only a personal bond signed by individual sureties resident in Idaho, conditioned for the payment of the $30,000, as provided in the above quoted agreement of May 2, 1921. (In that connection, as to what is usually required of sureties in this State, see Section 89-107 W. R. S. 1931.) No surety company bond appears to have been furnished, nor was this bond apparently approved as to form by the Attorney General of Wyoming, as provided by the "stipulation" of the parties as aforesaid.

The Osgood Company also made application to the United States General Land Office for the necessary rights-of-way for the construction of the several reservoirs and supply ditches contemplated by the Carlisle permits aforesaid, but failed to secure such rights-of-way, its application in that behalf being rejected by the Department of the Interior, the decision of the Commissioner to that effect being dated May 14, 1923. The sum of money mentioned in said agreement to be paid by the Osgood Company for bridge construction work, accordingly, in whole or in part was never forthcoming and nothing more seems to have been done in the matter of securing these rights-of-way.

Under date of April 15, 1920, the Idaho corporation, also named the "Osgood Land and Livestock Com-

pany", entered into a contract with the Utah Company agreeing to sell to the latter corporation, together with certain lands located in the State of Idaho, as well as certain Idaho water rights, "Five thousand (5,000) acre feet of stored water, the same being a storage right which the said party of the first part is securing for use upon the premises described in 'Group A'". "Group A" includes these Idaho lands. No lands in Wyoming are mentioned in said "Group A". In this connection it may be observed that while the reservoir permits Nos. 3770 Res. and 3771 Res. issued to Carlisle, as above described, do not describe the lands to be irrigated by the proposed stored water, the aforesaid permit No. 16190 for the Twin Reservoir Supply Canal and No. 4232 Enlargement, for the "first Enlargement" of the Twin Reservoir Supply Canal, in response to the statement in the official form used, "the land to be irrigated is described in the following tabulation" and the direction thereunder, "(Give Irrigable Acreage in Each 40-Acre Subdivision. Designate Ownership of Land, Government, State or Private. If private, Give names of Owners.)", do not supply any data of this kind whatsoever, the spaces left for township, range and section being left vacant. The permit No. 16190, above mentioned, was applied for by the Osgood Company through one O. A. Johanneson, who signed the application. Under date of September 14, 1921, permits Nos. 3770 Res. and 3771 Res. and 4232 Enlargement were assigned by C. C. Carlisle to the Osgood Company. Permit No. 16190, as well as permits Nos. 3770 Res., 3771 Res. and 4232 Enlargement, aforesaid, were on May 23, 1938, undertaken to be transferred by "Assignment and Quit Claim Deed" to the Utah Company and O. A. Johannesen by the Osgood Company and its Board of Directors last elected, the Osgood Company being recited as then "defunct".

The claim is now advanced and there appears to be

oral testimony that apparently was given before the State Engineer to that effect, that the five thousand acre feet mentioned in the contract between the Idaho Osgood Land and Livestock Company and the Utah Company, as described above, referred to the Osgood Company's rights obtained as heretofore stated, in the Two Ocean and Emma Matilda Reservoirs.

On July 23, 1935, the Utah Company made applications to the State Engineer of Wyoming to amend permits Nos. 3770 Res. and 3771 Res. to conform to the works originally constructed and existing. These applications set forth that the Two Ocean Reservoir was constructed to a total capacity of 3040 acre feet and the Emma Matilda Reservoir to 1340 acre feet. Applications were also made for secondary permits to apply this stored water to specific lands in Bonneville County, Idaho. Accompanying these applications were (1) a request on behalf of the Utah Company for a special permit to be issued by the State Engineer in favor of the Utah-Idaho Sugar Company, which would grant that corporation

"permission to take a certain quantity of water from the State of Wyoming into the State of Idaho for the application of beneficial use to lands in Bonneville County, Idaho, which water is appropriated to the Utah-Idaho Sugar Company under the following Permits issued by you to them.
"No. 3770-R, No. 3771-R, and Secondary Permits
No. 3770-R. and No. 3771-R.", and

(2) a request on behalf of said Utah Company for

"cancellation of the following Permits now held in the name of the Osgood Land and Livestock Company on your records, and according to a complete report filed herewith, assigned from the Osgood Land and Livestock Company to the Utah-Idaho Sugar Company, of Salt Lake City, Utah, a Utah corporation, and whom I represent as Agent:
"Permits No. 3770-R, No. 3771-R, No. P-16190 and No. 4332 Enl.

"I also request, as agent for the Utah-Idaho Sugar Company, that the date of priority in each case be preserved and applied to amended application for secondary Permits filed herewith."

These requests were signed by "Karl S. Albert, Agent for the Utah-Idaho Sugar Company".

Just here it may be noted that the Twin Reservoir Supply Canal, and, of course, the enlargement thereof were never constructed. Request numbered "(1)" supra was evidently made to obtain action on the part of the State Engineer under Section 122-1601 Revised Statutes, 1931, which reads in part:

"and provided, further, that the water stored in any reservoir cannot be used outside the boundaries of the state of Wyoming without special permit from the state engineer; and provided, further, that the state engineer may deny any use of water from any reservoir that would be detrimental to the public interest."

This statute was enacted originally by the sixteenth state legislature and received executive approval February 23, 1921.

The Land Company made its protest to the State Engineer of Wyoming against these applications for amendment upon several grounds; first, as owner of certain lands in this state included under the secondary permits and adjudications of the original construction of the two reservoirs; and, second, as a corporation formed for the purpose of preserving through subsequent government ownership and control "certain of the scenic features and beauty spots in Jackson Hole".

June 1, 1938, a hearing was had before the State Engineer of Wyoming. Testimony was taken and evidence submitted regarding these matters which are outlined above. This hearing resulted in orders being made by the official last mentioned under date of December 3, 1938, that Permits Nos. 3770-Res., 3771-Res., 16190 and 4232 Enlargement be cancelled; that appli-

cations for amendment of Permits Nos. 3770-Res. and 3771-Res. be rejected and that

"It is further ordered that applications for secondary permits for use of water stored under Permits Nos. 3770 Res. and 3771 Res., under filing numbers 13 3 & 4/357, and application for special permit to use water stored in Two Ocean and Emma Matilda Reservoirs outside the State of Wyoming be and the same hereby are rejected."

This action of the State Engineer was affirmed on appeal by the Utah Company to the Board aforesaid, by order of that Board dated July 24, 1939, giving as its reason for its action in the premises that "the State Engineer in rejecting said applications is hereby sustained for the reason that the State Engineer and the State Board of Control are now prohibited under Chapter 125, Session Laws of Wyoming, 1939, from granting permits for any appropriation or development of the State's waters while within the State's boundaries in whole or in part for use outside the State". The Utah Company then removed the matter by appeal to the district court of Teton County, which, by its judgment dated December 19, 1940, affirmed the action of the Board, "excepting, however, the reason" stated in the Board's order, as aforesaid. From this judgment the present appeal was carried to this court.

On these facts our views are, briefly stated: We are inclined to think that Permits Nos. 3770 Res., 3771 Res., 16190 and 4232 Enlargement were granted subject to the express condition that in the event the United States General Land Office refused to grant the necessary rights-of-way required for the construction of the contemplated reservoirs and the required supply canals, as described in said permits, the agreement and the permits aforesaid should cease to be operative. When the endorsements upon all of these permits made by the State Engineer and quoted above, the provisions of the agreement of May 2, 1921, and the attached stip-

ulation, are considered together, as they should be, we believe no other construction is reasonably possible. It is plain that the General Land Office of the United States refused to grant the necessary rights-of-way. No bond was given as directed by the agreement of the parties and no money was paid as required by said agreement. The time for commencing and completing construction under said permits has long ago expired. This situation prevailed for many years after the refusal of the rights-of-way, as mentioned above, evidently with the acquiescence of all concerned. Under such circumstances to grant the secondary permits now sought, when the application does not have and has not been able to obtain the rights-of-way to construct or maintain the necessary storage works, would be productive of nothing but trouble between the State and Federal sovereignties, and undoubtedly would be "detrimental to the public interest".

A familiar principle in the law of contracts pertinent just here has been thus stated by this court in Rohrbaugh v. Mokler, 26 Wyo. 514, 188 P. 448:

"It is well settled that if the meaning of a contract or instrument is doubtful on its face, the practical construction put upon it by the parties should have great weight in determining its proper construction. * * * * This is especially true where the parties have for a long time acquiesced in and acted, in good faith, upon such practical construction."

In the case at bar the parties affected by these agreements described above have for a long period of time acquiesced in the construction given them as above set forth.

The applications in the case at bar, as appears from the "request" numbered "(2)", supra, also desire priorities which could exist only if the conditional permits became effective, otherwise non-operative grants of such a character could prevent other parties from ob-

taining water rights which they were fairly entitled to have.

Again, Section 122-1601, W. R. S., 1931, as we have noted above, invests the State Engineer with discretion to "deny any use of water from any reservoir that would be detrimental to the public interest". Under this power we are unable to perceive that that officer abused the discretion vested in him in taking the action he did.

It is urged that because the permits covered by the agreement of May 2, 1921, were not surrendered for cancellation they remain in full force. We cannot agree to this view. That contention would reform subdivision "V" of the agreement of May 2, 1921, to read in effect:

"It is finally agreed and understood between the parties hereto that this agreement shall become null and void upon the party of the second part surrendering and delivering to the party of the first part, for cancellation, the said permits to be issued by him and which are covered by this agreement".

This cannot fairly be done in disregard of the other provisions of that paragraph as written by the parties themselves and all the other instruments, which, as we have said, must be construed with it. A construction such as urged would put it in the power of the Osgood Company, by merely withholding the permits, to retain all rights thereunder. That the parties never intended such a construction to be assigned to the paragraph aforesaid is, we think, perfectly apparent. Undoubtedly a construction of this kind would produce a result unreasonable and unfair to the State of Wyoming and its citizens.

On the merits of this case then we are convinced that the district court was right and its decision should be affirmed.

On account of its importance we have seen fit to con-

sider rather in extenso the facts involved in the cause. We need not have done so. As previously presaged, the record brought here on this direct appeal is in such a condition that a similar result must be reached thereunder, and as already intimated what was said above was set forth subject to the condition of that record.

In Simpson v. Occidental Building & Loan Assn., 45 Wyo. 425, 19 P. 2d 958, this court said, speaking of the certification of a record under the direct appeal method of appellate procedure:

"The form for certification of the record required by the statute is of the simplest: i. e., that it be 'true and correct'. Yet, again and again, we are confronted with long and elaborate certificates placed in the record where they should not be, which frequently serve only to cause trouble. Where, as in the certificate now being discussed, only separate papers are undertaken to be certified and the statutory form of certification not used, the danger is great that an important paper will be overlooked and not included therein. Indeed, that is true here, thus rendering the clerk's certificate fatally defective in another particular. While the copy of the notice of appeal, itself, is properly certified, nothing whatsoever appears in the certificate concerning the due proof of service thereof, something which is a vital prerequisite to the power of this court to consider a case on appeal and which must appear from the record. See Culbertson v. Ainsworth, 26 Wyo. 214, 181 Pac. 418; Koch v. Koch, 41 Wyo. 450, 287 Pac. 85; Lindback v. Lackey, 41 Wyo. 493, 287 Pac. 320."

In the record before us the clerk's certificate, appearing as the first four pages of the record, recites a certification "that the attached and foregoing are all of the original pleadings, motions and stipulations and is a full, true and complete transcript and copies of all Journal Entries made and entered in the Matter of the Appeal of Utah-Idaho Sugar Company from the State Board of Control in a proceeding wherein Utah-Idaho Sugar company was applicant and Snake River Land Company was protestant upon the following applica-

tions :" After listing these applications, six in all, the certificate proceeds: "and that accompanying this transcript is a Transcript of the Testimony taken before the State Engineer and of all Exhibits offered and received in the proceeding, which Exhibits are more particularly described as follows :" This is followed by a list of 47 purported Exhibits, and also lists Exhibits A to J, inclusive. Thereupon the certificate concludes: "and said Exhibits are identified by the date December 28, 1939, and by the initials 'E. L.' which are the initials of Earl Lloyd, Deputy State Engineer and Ex-officio Secretary of the State Board of Control." It will be observed that the notice of appeal and due proof of service thereof are not even mentioned in the certificate aforesaid and, of course, are not certified at all as they should be. Neither is the specification of errors "authenticated" by the clerk, as required by Section 89-4906, W. R. S. 1931.

In the record thus undertaken to be certified we find a stipulation signed by counsel for all the parties herein, which reads, omitting title and signatures:

"Subject to the pleasure of the Court, it is stipulated by the parties that the appeal in the above entitled matter may be submitted upon the record filed, either party to have the privilege of filing written brief and to make oral argument at such time as the court may set the matter for hearing, and to file such reply brief as may be desired within such time as may be fixed by the court at the time of the hearing."

We take this stipulation to mean that the entire filed record, presumably the record on appeal from the State Board of Control, is intended—shall be regarded as admissible or admitted competent evidence—"subject to the pleasure of the court", whatever that phrase may mean.

If the language of the phrase aforesaid means that the court may act upon only those certain portions of the record which the court regarded as relevant to the

issues of the appeal, then, of course, it is evident that it is impossible for this court to determine upon what portions of the record the action of the court below was taken. Under the well known principle of appellate court practice, it being the duty of the appealing party to demonstrate prejudicial error on the part of the trial court, the judgment could not be reversed. If the remaining portion of the stipulation means that the parties may present by brief and oral argument such portions of the "record filed" as each of them regarded as supporting their views of the case, then the same condition of affairs would prevail so far as this court is concerned as if the matter were left to the trial court to select the portions of the record upon which to render judgment. If, however, the stipulation means, as seems to us likely, that all the record filed on appeal from the Board shall be taken as all the admitted evidence in the case for both the district court and the parties, then we have a situation where the cause was tried below on an agreed statement of facts, and what is said hereinafter is definitely applicable.

Section 89-4905, W. R. S. 1931, pertaining to the transcript of the evidence on direct appeals brought to this court, reads:

"Whenever the party appealing desires to review the ruling of the district court on the admission or exclusion of evidence, or questions the sufficiency of the evidence to sustain the verdict, finding, judgment, or decision, or alleges the verdict, finding, judgment or decision is contrary to law, the party appealing shall cause to be prepared by the official court reporter a complete transcript of all the testimony offered at the trial, with each question consecutively numbered, and showing all rulings of the court in admitting or excluding evidence, or in directing or refusing to direct a verdict for either party, which transcript of the testimony and rulings of the court shall be certified to by the official court reporter as being true and correct, and as containing all of the testimony offered at the trial, with the rulings

of the court in admitting or excluding evidence, or in directing or refusing to direct a verdict for either party. When the record of the testimony offered at the trial, and the rulings of the court to be included therein, are prepared and certified as provided in this section, the same shall be filed with the clerk of the district court within seventy days from the date of the entry of the order or judgment appealed from, or within the time as extended by the court or judge."

A study of the brief of appellant indicates that the grounds upon which the judgment below is questioned are that such judgment is not sustained by sufficient evidence and is contrary to law. Nevertheless there is no certificate at all appearing in the record before us by the official court reporter that the transcript of the evidence is true and correct and as containing all the evidence offered at the trial, as contemplated and required by the positive mandate of the law set forth in the Section 89-4905, supra. It is hardly necessary to state that parties by their mere stipulation may not overthrow definite statutory requirements governing appeal procedure to this court.

In Reddick v. Board of Commissioners of Pulaski County, 14 Ind. App. 598, 41 N. E. 834, the court speaking of an agreed statement of facts said:

"When the parties agreed upon the facts, as in this case, they do nothing more than to simplify the trial by obviating the necessity for making proof, and such facts when agreed to, do not constitute a special finding of facts, and an exception to a conclusion of law based upon such facts presents no question on appeal to this court. Henes, Admr. v. Henes, 5 Ind. App. 100.

"The statement of the facts agreed to, when the case is not an agreed one under the statute, is mere evidence and nothing more. It is an agreement that the evidence would establish the facts embodied in the statement. Robbins v. Swain, Exr., 7 Ind. App. 486.

"In a trial upon an agreed statement of facts, as the evidence in the case, such statement does not become a part of the record unless made so by bill of exceptions

or order of the court. Pennsylvania Co. v. Niblack, 99 Ind. 149."

It is true these observations were made concerning a bill of exceptions and it is well established in this jurisdiction that no bill of exceptions is required in direct appeal cases in this court. Barnett v. Bankers' Finance Ass'n., 38 Wyo. 511, 268 P. 1025. However, the certified transcript required by Section 89-4905, W. R. S., 1931, stands in its stead.

The same rule as prescribed by the Indiana court prevails in Ohio. In Goyert & Vogel v. Eicher, Adm'r., 70 Ohio State 30, 70 N. E. 508, it was held that an agreed statement of facts, although in writing, signed by counsel for all parties, and filed, did not become a part of the record unless brought upon the record by a bill of exceptions, or the facts as agreed upon were set forth in the journal entry as the court's finding of facts. To the same effect is the case of Bank of Virginia v. Bank of Chillicothe, 16 Ohio 170, and the cases of Gallagher v. Zangerle et al., 42 Ohio App. 249, 181 N. E. 913; Williamsburg Tp. et al. v. Maham, (Ohio App.) 32 N. E. (2d) 451. See also Prokop v. Mlady et al., 136 Neb. 644, 287 N. W. 55; Standard Life Insurance Co. of the South v. Adams, 174 Tenn. 405, 126 S. W. (2d) 311).

In Lusk Lumber Company v. Independent Producers Consolidated et al., 46 Wyo. 341, 26 P. (2d) 1075, there was a stipulation reading, so far as its material part was concerned:

"It is hereby stipulated by the parties hereto that this cause shall be tried to the Hon. C. D. Murane, Judge of the District Court of Natrona County, without a jury, each party to use such portion of the former record as he may desire."

It was pointed out that:

"An inspection of the record now presented on this appeal from the judgment mentioned, discloses that,

apparently, no record of the proceedings had upon the trial of the case was made by the official court reporter, and, in consequence, no certified transcript of the evidence presented to, and considered by, the district court, with the parties' objections and exceptions thereto, and the court's rulings thereon, as required by section 89-4905, Wyo. Rev. St. 1931, is here for our examination."

The judgment in that case also contained a recital:

"And it further appearing to the satisfaction of the Court that counsel for the respective parties had stipulated and agreed that the matter might be presented to the Court upon the record, including the testimony introduced at the former trial, and that counsel might read from the transcript, duly certified to by the official Court Reporter reporting said cause, and the Court having announced its willingness to hear said cause upon the record and said transcript, counsel thereupon read to the Court the pleadings in said cause, with the exhibits, together with the transcript of the testimony, and both parties having announced that no further evidence would be offered, the Court proceeded to hear the arguments of counsel in support of their respective positions, and, after argument thereon, and the Court being now fully advised in the premises, finds, etc."

And the judgment below was affirmed.

Without further extending this opinion we find ourselves obliged to affirm the judgment of the district court of Teton County.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.