Emma Breen KENNEDY, Appellant
(Defendant below),

v.

STATE of Wyoming, Appellee
(Plaintiff below).

No. 3466.

Supreme Court of Wyoming.

Jan. 6, 1967.

Oscar A. Hall, Rawlins, for appellant.

Dean W. Borthwick, Deputy Atty. Gen., Cheyenne, for appellee.

Before PARKER, C. J., and HARNS-BERGER, GRAY, and McINTYRE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Defendant, Emma Breen Kennedy, convicted by a jury of second-degree murder and sentenced to a term of from twenty to twenty-one years, has appealed, contending that she was deprived of the right of counsel, that her written confession was inadmissible as not being voluntarily given, that the evidence is insufficient to sustain a verdict of murder in the second degree, and that certain statements of the court made in the presence of the jury were prejudicial to her.

The salient facts relating to the occurrences on the night of the homicide do not seem to be in dispute. On the evening of May 23, 1964, defendant was arrested by the city police in Rawlins for driving while under the influence of intoxicating liquor and because the police had no place to maintain a female prisoner was brought to the Carbon County Sheriff's Office about 7:40 p. m., remained there until approximately 9 p. m., when her husband made bond for her and the two departed, proceeding by automobile toward Sinclair, Wyoming, some four or five miles distant. On the way, she got out of the car once, flagged down another automobile, and attempted to get a ride back to Rawlins, but apparently unsuccessful in the attempt, proceeded with her husband to Sinclair and went directly to their home at 103 South Eighth Street. The defendant's next-door neighbor, Mrs. Lois Smith, saw the Kennedy car arrive between 9:15 and 9:30 p. m. and saw defendant climb out and go into the house. Defendant herself testified that upon her entrance into the house she pushed a couch in front of the door to attempt to keep her husband from coming in. Her husband thereafter pushed the door open, at which time the defendant pointed a pistol at him and told him not to come in the house. He left and went next door and returned with their neighbor, Mrs. Smith, who tried talking to defendant from the porch through the closed door, in front of which Mr. Kennedy and Mrs. Smith were standing. Mrs. Smith turned to leave the porch and a shot was fired through the door, fatally wounding Mr. Kennedy. Defendant testified that she had a gun in her hand, was swinging it from side to side, and that it discharged. It was this shot, which pierced the door and hit Mr. Kennedy in the chest, that Mrs. Smith heard when she turned to leave the porch. An ambulance was summoned and Mr. Kennedy was taken to the hospital, where he was pronounced dead less than an hour later; meantime, defendant was placed under arrest and taken into custody. Later, after a purported warning by the sheriff, the defendant made a statement concerning what had happened. Upon completion of the statement, she inquired about her husband; the sheriff telephoned, ascertained that he was dead, told the defendant, and she said that she was glad.

### Deprivation of Right to Counsel

Appellant contends that she was denied counsel as required by Art. 1, § 10, Wyo. Const., and amend. VI, U.S.Const., and urges that the rule announced in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, is here applicable, which provides, inter alia, 84 S.Ct. at 1765, "where * * * the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, * * * no statement elicited by the police during the interrogation may be used against him at a criminal trial."

Since defendant does not contradict the testimony that she was advised of her right to counsel both orally by the sheriff and in the preface to her written confession, the basis of her argument seems to be that following the shooting and at the time of her arrest and subsequent interrogation she was in such a state of shock and intoxication that she was without capacity to intelligently waive the right of counsel. However, she cites no cases dealing with the effect of a defendant's being intoxicated at the time he is advised of his constitutional rights.

Testimony concerning the occurrences on the evening of the crime is of significance. Sheriff Ogburn testified that after going to the scene of the shooting and arresting the defendant he took her to the county jail, booked her, and asked if she wished to have an attorney or make a telephone call. He also asked her if she would like to make a statement pertaining to the incident. She said she would, whereupon he advised her that she did not have to make a statement and that she could have counsel; she replied she would like to have someone to talk to and get it off her mind. The sheriff testified that he thereafter repeated his statement that she was allowed counsel and did not have to make a statement but if she wanted to do so, he would take one. He testified that defendant then said, " 'I am awful nervous and I would rather have the girl there write it out for me.' " The statement, the first page of which was a narrative account of certain happenings, and the second, third, and fourth pages, questions to and answers from defendant, was thereupon, commencing at 10:52 p. m., written down by Diana Sanchez, the sheriff's stenographer. Sheriff Ogburn testified that it was his opinion that during the evening of May 23 the defendant was not intoxicated although she had been drinking. Miss Sanchez said she first saw defendant in the jail about 10:30 p. m., that defendant then wanted to go home and promised if they would permit her to return to her home she would stay there, that Sheriff Ogburn refused but said she was allowed to call an attorney from the kitchen in the jail, and that defendant said she did not want an attorney. When asked if Mrs. Kennedy had been drinking, Miss Sanchez replied, "I did not know she had been drinking. She did not seem to be drunk at that time. * * * She walked perfectly well * * *." She said that defendant was nervous and shaky and seemed as if she had been crying.

While various witnesses of defendant testified that she was intoxicated prior to the time of the homicide, defendant presented no evidence other than her own statement that she was intoxicated at the time that she was taken to the jail and subsequently when she gave the statement. Defendant said she did not know when she took the last drink on May 23, and without question was nervous and somewhat shocked by the occurrences of the evening; but the testimony of the sheriff and his stenographer constituted clear and definite evidence that although admittedly she had been drinking during the evening she was not at the time of the statement intoxicated to such a degree as not to know what she was doing but was fully aware of what was happening. Under this state of the record, we cannot hold that the defendant was without capacity to intelligently waive the right of counsel, and accordingly, the first claim of error is not justified.

### Inadmissibility of Confession as Not Being Voluntarily Given

Closely allied to the claim that defendant was denied counsel is that of her written confession's being inadmissible. The purported confession, written in pen by Miss Sanchez, consisted of four sheets, each beginning with the printed statement (with blanks appropriately filled in): "TIME ———— DATE ———— PLACE ———— I, ————, HAVING been advised of my rights under the FIFTH AMENDMENT to the CONSTITUTION as to compulsory self incrimination, my right of counsel and my right of trial, and knowing that anything that I say may be used against me in a court of law, and

knowing that I do not have to make any statement at all do hereby volunteer the following to ———— who has identified himself as ————," and each signed at the bottom by the defendant and witnesses. As heretofore noted, the first page is a third-person narrative by the sheriff of the happenings of the evening relating to Mrs. Kennedy and was obviously not the statement in the words of the defendant. The following pages purport to be questions propounded by the sheriff and answered by the defendant.

Our foregoing discussion concerning right to counsel contains various references to evidence regarding defendant's condition as to sobriety and understanding and those same circumstances are here relevant in our consideration of the voluntariness of her statement. It is unnecessary to again delineate the testimony which showed that defendant was advised of her constitutional rights, warned that anything she might say could be used against her in a court of law, and told of her right to have counsel.

Miss Sanchez said she wrote down defendant's statements and "When I was writing it she [defendant] was telling me what to put down and she would comment that it was right. * * * She was watching me while I wrote it." This testimony, coupled with that of the sheriff previously mentioned, indicates that Mrs. Kennedy was not so intoxicated as to lack understanding as to what she was doing, that she voluntarily answered the questions, and signed the statement without coercion or persuasion from the authorities. She does not deny any of this testimony regarding the taking of the statement but merely says that she doesn't remember. The court passed upon the voluntariness of the statement in the first instance and thereafter instructed the jury that before it might take the confession into consideration it must for itself find whether or not it was voluntary.

Some point is made of a discrepancy in a typed statement on the "Arrested Prisoner's Information"[1] taken at the time that Mrs. Kennedy was arrested at 7:40 p. m., May 23, for driving while under the influence of intoxicating liquor, which indicated her residence was "Saratoga, Wyoming." However, such discrepancy has little probative force to show the sobriety or nonsobriety of defendant at 7:40 p. m. and relatively less as related to her condition at 10:52 p. m. and thereafter.

■ From our review of the record, we conclude that the trial court was fully warranted in holding that the written confession of defendant was voluntarily given after she had been advised of her constitutional rights.

### Sufficiency of the Evidence to Sustain Verdict

Whether or not the evidence adduced at the trial was sufficient to sustain a verdict of murder in the second degree is, of course, a question which requires careful analysis and consideration. The statute upon which the conviction is predicated, § 6–55, W.S. 1957, reads, "Whoever purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree * * *." It is argued that under the holding in Nunez v. State, Wyo., 383 P.2d 726, in order to sustain a conviction of second-degree murder, the State must prove beyond a reasonable doubt that the defendant killed the victim purposely, meaning intentionally or deliberately, and maliciously. However, as will be observed, such general rule is not particularly helpful in resolving the problem. Admittedly, the deceased died as a

1. There was also some point made during the trial about the "Arrested Prisoner's Information" prepared at 10:05 p. m., May 23, in that following the word "charge" there had been typed "2nd Degree Murder," lines had been placed through "2nd" in pen, and "1st" written above the deletion. However, according to the sheriff's testimony, that portion had been left blank at the time the defendant was booked at 10:05 p. m., and the next morning "2nd Degree Murder" had been typed in and then subsequently changed to "1st."

result of a bullet wound inflicted by the discharge of a gun held in the hand of defendant and appellant concedes on the authority of 41 C.J.S. Homicide § 316, p. 29, that malice may be inferred from the use of a deadly weapon, but says, according to 40 C.J.S. Homicide § 25, pp. 876 and 877, in order that an implication of malice may arise from the use of a deadly weapon, it must appear that its use was willful or intentional, deliberate, or wanton, arguing that here "[a]s in the Bruner case [State v. Bruner, 78 Wyo. 111, 319 P.2d 863] the exact use of the gun is unknown." This, we think, is a statement not borne out by the record. The occurrences immediately prior to the shooting by Mrs. Kennedy are delineated by three sources, (1) her own testimony on the stand, (2) the witnesses present, and (3) her confession.

Mrs. Kennedy in her testimony told of leaving the sheriff's office about 9 p. m. on May 23, 1964, following her release on bond under the motor vehicle charge, in company with her husband, of how en route home she got out of the car and attempted to flag down passersby to take her back to Rawlins, of getting into the rear seat of the Kennedy car when she was refused a ride and their proceeding to 103 South Eighth Street, Sinclair, where she got out of the car. She then testified, "I walked into the house and I pushed the couch against the front door. * * * the next that I remember Gene opened the door. The light was on and he opened, he pushed the couch away from the door and opened the door. At the particular point there was a gun on the coffee table. I picked it up and pointed it and I said, 'Don't come into the house.' * * * Gene closed the door and backed out. I walked over and turned off the light and started to go to the bedroom. * * * I had * * * gotten probably to the hall when Lois came over, and came on the porch and she said, 'Emma, come and let me in.' * * * I had the gun in my hand and I swung it like this (indicating) and I said 'Get Off the porch.' Just 'Damn, get off the porch.' I was swinging this

gun like that away from me." When asked what Mrs. Smith said in return, she responded, "She asked me to let her in. She asked me to have coffee with her I think. or something like that. I don't remember. * * * I was swinging the gun this way (indicating). The thing went off right in front of me and it was just—went wham like that (indicating) and that was this horrible blue fire and all this noise and everything. Then I just don't remember. * * * There seemed to be a lot of confusion and I remember Lois saying to me that I had shot Gene."

Mrs. Lois Smith said that at about 9:30 p. m., May 23, Mr. Kennedy knocked at her door and asked if she would go over and try to talk to his wife. Mrs. Smith thereupon called her on the telephone but received no answer and went over to the house. In her own words, "We went—I went to the front door and knocked, and called to Mrs. Kennedy. She answered me. * * * I asked her if she would open up the door and let me in. * * * She said, 'No.' * * * I asked her if she wouldn't come over to the house and have a cup of coffee with me. She said, 'No, God damn it, go away.' Then I said, 'I will go on home and make coffee and call you when it is made and you come over.' * * * I turned away to leave the porch. * * * There was a shot. * * * Mr. Kennedy said 'My God, she hit me.' * * * [I was] right at the door * * * next to * * * [Mr. Kennedy]." When asked if she heard anything before the shot, she said, "There was a sound that I assumed was keys going into the door or jingling," and that she heard the shot almost instantaneously. (Although Mrs. Smith said that for all she knew the jingling could have been change in Mr. Kennedy's pocket, she admitted that shortly after the shooting she had given a statement to the prosecuting attorney indicating that Mr. Kennedy tried to put the key in the door and then the shot was fired.) Mrs. Smith immediately went to get her husband and called the sheriff. Later, in order to provide ade-

quate lighting for her husband, she entered the Kennedy house through the back door and turned on the porch light. At that time she found the Yale lock on the front door locked.

Sheriff Ogburn testified that upon his arrival he found Mr. Kennedy lying on the porch in great pain and that Mr. Kennedy had then stated he had been shot by his wife. The sheriff went inside the house, informed defendant she was under arrest for shooting her husband, and subsequently took her to Rawlins. At about 10:50 p. m., the sheriff with his stenographer took the statement to which reference has been made heretofore. In that statement he asked:

"Q. In your own words can you tell me what took place concerning the shooting? A. Gene came in the front door and I had the gun, and I said 'Go away or I'll shoot you.' He closed the door and I had the gun in my hand, and when Gene said something to me, I can't remember what he said, and I told him to go off of the porch. It was quiet, and I pulled the trigger, and Lois told me that I had shot Gene. * * * We then went over to her house and she called the police or the ambulance. If I had known the gun was loaded, I would never have pulled the trigger."

Miss Sanchez testified that after the statement had been given, a little before midnight, defendant asked about her husband, the sheriff telephoned and was advised of his death, and when he so informed Mrs. Kennedy, she said, " 'I have no remorse. I am glad.' "

■ From the testimony of Mrs. Smith, together with that of the defendant herself on the witness stand, the jury would have been justified in believing that when deceased opened the door and pushed the couch away from it defendant picked up the gun, pointed it and said, " 'Don't come into the house' "; that subsequently while defendant had the gun in her hand she swung it and said, " 'Damn, get off the porch' "; that she fired the fatal shot through the door, striking deceased; and that immediately prior to the shooting deceased had started to unlock the door and defendant could have heard the movement of the keys. These circumstances disclose a situation totally unlike that in Bruner, where the court said the exact use of the gun was unknown, and were sufficient upon which the jury might predicate a verdict of intentional shooting despite defendant's protestations of no intent. The admission of defendant in her statement that she had told deceased, " 'Go away or I'll shoot you,' " and that thereafter she pulled the trigger, and her statement that she was glad for deceased's death were additional evidence which tended to show intention. Moreover, even without reference to intention, the evidence was sufficient to show the commission of a wanton act in the shooting.

### Statements of the Court

■■ Careful attention has been given to the argument that the words of the court in the presence of the jury were highly prejudicial to the defendant. She insists that after she had explained her confusion in trying to reconcile certain matters and the court had admonished her to just tell "what you do remember," the court, following one of her noncommittal replies, had said, "Ma'am you asked for advice and I said to you if you don't know to answer I don't know. Now this may or not be good advice to you because if you don't know anything except certain things that might sound bad for you, and I probably shouldn't have talked to you in the first place. Having talked to you and answered you I think I ought to say that you ought to remember everything you can." Also, it is charged that when the defendant was demonstrating the swinging of the gun as of the time of the shooting the court said, "You would have got the Reporter that time." The first-mentioned remark by the court would seem to be normal and proper, if anything was to be said to the witness at all. Certainly, no prejudice can come from an admonition to remember everything possible.

There was no basis for the court's having said anything at the time of the second remark, but we do not consider it error, and neither precedent nor cogent argument is presented to show that it was prejudicial. It is argued that in Kendrick v. Healy, 27 Wyo. 123, 192 P. 601, this court indicated that comment by the trial judge should be within due bounds and appropriate to the character of the occurrence, and we adhere to that view. However, we find no violation of that established rule by the trial court nor abuse of discretion.

Since there was no error in the trial of the above-entitled cause, the verdict of the jury and the judgment of the court must stand.

Affirmed.

McINTYRE, Justice (concurring specially).

Without deciding whether the confession of defendant ought to be clothed with the mantle of voluntariness, I feel justified in concurring in the result reached by Chief Justice Parker on this point because I think the appellant has failed to show any damage or prejudice to her position from the admission of her confession.

As I see it, there is no substantial difference in the narrative of facts as defendant related them in the confession instrument and in the facts as she related them at the trial. Also, appellant's attorney still relates in substance the same set of facts on behalf of his client in stating her position on appeal. Thus, it would appear defendant is not claiming she was induced or tricked into an erroneous or misleading statement.

Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, have laid down important new safeguards. The purpose of such safeguards, however, is to make sure a confession is reliable before it is used against a defendant. But in this instance the question of reliability is removed, as far as our consideration is concerned, because appellant does not claim any

facts were incorrectly stated in the written confession. There is therefore no need to apply Escobedo or Miranda.

In appellate procedure, the appellant has the burden of showing harmful or prejudicial error before he is entitled to a reversal. Tompkins v. Byrtus, 72 Wyo. 537, 267 P.2d 753, 756; In re Utah-Idaho Sugar Co., 57 Wyo. 425, 120 P.2d 601, 608. See also Honda v. People, 111 Colo. 279, 141 P.2d 178, 186.

Appellant in this case has not pointed out wherein she was hurt or prejudiced by the statement she afterwards corroborated in her own testimony. If there was irregularity in submitting her written statement to the jury, the burden (as in any other case) is still on the appellant to show how and why it resulted in harm or prejudice to her. No effort has been made to show actual harm from the statement, and we cannot say prejudice follows as a matter of course.

Another way of arriving at the same result would be to say that defendant's subsequent corroboration of her written statement sufficiently contradicts her claim of involuntariness to confirm the finding of voluntariness made by the trial judge.

In any event, to make my position clear, I am not saying I would be upholding the finding of voluntariness with respect to defendant's confession, if the evidence had shown a substantial conflict in the confession and the defense offered by defendant at her trial. I am saying only that it does not appear, from the record in this case, that defendant was prejudiced by a written statement she afterwards, at the trial and now on appeal, corroborates.

 I concur in the opinion of Chief Justice Parker insofar as it relates to the sufficiency of the evidence to sustain the verdict of the jury, and insofar as it relates to an absence of prejudicial error in statements of the trial judge, which are complained of by appellant.

GRAY, Justice (dissenting).

I am not persuaded that the confession of the defendant ought to be clothed with

the mantle of voluntariness. There are circumstances present which give rise to serious doubt. I will agree at the outset that the facts here in certain respects can be distinguished from the precise holding of the United States Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977—which is with us—and that the important new safeguards laid down in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694—decided subsequent to the instant trial—need not retroactively be applied. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Nevertheless, in this case the court went on to say, "the nonretroactivity of these decisions [Escobedo and Miranda] will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim," 86 S.Ct. 1779, and that the defendant has done. Thus, as I understand it, the approach here, in view of the factual situation, is to treat the impact of those cases as a factor to be considered, along with others, in testing the voluntariness of the confession. See also Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895.

To me the rationale of the foregoing cases, and other cases recently decided by that court, make it clear that the critical question before us is whether or not the State met its burden of establishing that defendant voluntarily, knowingly, and intelligently waived her constitutional right to the assistance of counsel and her right to remain silent under police interrogation. That, in my view, is the decisive factor of defendant's claim. In the quest for a solution to this problem there is first to be put aside, as of little probative force, the ritualistic recital of defendant's constitutional rights as set forth in the printed material on each page of the confession. Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 1342, 1343, 10 L.Ed.2d 513; Miranda v. State of Arizona, supra, 86 S.Ct. 1637. The testimony of the sheriff

that he also advised defendant in ritualistic fashion of her rights is likewise of little assistance on the question of waiver; but he did go further and say that he asked her if she would like to have an attorney or make a telephone call and she answered, "No." Also, that he asked her if she would like to make a statement "pertaining to the incident" and the defendant answered that she "would like to have someone to talk to and get it off her mind." The taking of the confession was commenced some forty-seven minutes thereafter. No doubt these circumstances, standing alone, could constitute a waiver. Miranda v. State of Arizona, supra, 86 S.Ct. 1628. Here, however, those circumstances do not stand alone. It is claimed that defendant because of shock and intoxication at the time was without capacity understandingly and intelligently to waive her rights.

While the claim of intoxication of the confessor in the early days of confessions received rather short shrift as grounds for excluding a confession, 23 C.J.S. Criminal Law § 828, pp. 227, 230, and received rather short shrift at the hands of the triers of the fact here, it is my view, nevertheless, that a more meticulous inquiry must now be made into the matter to the extent it bears upon the issue of waiver. In this I think we are no. longer free to apply our own rules and accept as binding the disposition made of the issue by the trial judge or a jury based upon conflicting testimony. We are duty bound to examine the entire record and to make our own independent determination on the ultimate issue. Davis v. State of North Carolina, supra, 86 S.Ct. 1761, 1764. That is not to say, of course, that findings below are not entitled to some weight. Haynes v. State of Washington, supra, 83 S.Ct. 1344.

Inasmuch as we must look to the totality of the circumstances, it will be necessary rather fully to set forth the evidence pertaining to the matter of waiver. No special effort will be made to distinguish between the testimony offered at the separate voluntariness hearing before the trial judge

and that adduced in the trial before the jury. In all fairness to the trial judge, however, it is pointed out that the only testimony he had before him in contravention of the State's evidence on the question of sobriety was defendant's own statement that she was drunk at the time the statement was taken and remembered little about it, except she did talk to the sheriff. Perhaps it would be well here to set forth the gist of her testimony. When asked about the circumstance she said, "Mr. Bates, I don't know a thing. I don't remember one thing I said to the man. I was asleep. I was drunk. I had been drinking for three solid days when he picked me up. I don't remember a thing in the world about it." Later she testified that she started drinking the evening of the twenty-second. She remembered being put in jail and that she "went to sleep." She had no idea how long, but they awakened her and gave her some coffee and the sheriff said "he wanted to take a statement." She did not, to her knowledge, discuss anything about attorneys or her constitutional right concerning use of the statement.

Turning now to the continuity of the testimony on defendant's drinking, I start with defendant's uncontradicted statement that she started drinking the evening of the day preceding the day of the shooting. She had some beer the next morning and that afternoon went to a private club in Rawlins. The bartender testified that he served her a couple of beers; that she was drunk; that she staggered; and at about 4:00 p. m., after she had gone out to the car and had come back, he refused to serve her more because he thought "she might go out in the car and sit down there and get sober." The wife of the bartender was there and said defendant was "intoxicated" and it was "noticeable." She went out to the car with defendant and offered to take her home or to a motel but defendant refused. The witness observed four or five cans of beer in a six-pack on the floor of the car. The defendant's conversation was not exactly "intelligent."

Later that evening the defendant's erratic driving of the car was brought to the attention of police officer Jacobson. According to the officer, he pulled up alongside defendant's car at a "drive-in" and asked to see her driver's license. Before she got it out he ascertained she was in no condition to drive and told her so. He testified, "She spoke loudly and incoherently," he could smell alcohol, "her eyes were glazed," and he smelled liquor. The inside of the car was a mess. There was food scattered around and a bottle of whiskey in the car, lying on the back seat. It was a half-pint and was half empty. He informed her she was under arrest for driving under the influence, but she paid no attention to him and also she paid no attention when he ordered her to get out and get into the police car. He said she then saw a car traveling east on the highway and told him the driver was a neighbor. He waved him over and it was a young man by the name of Smith. Smith said he knew the defendant and was a next-door neighbor, but defendant said she "didn't want to go home, she'd rather go to jail." Jacobson told her, "O.K., get in the police car," but she didn't move and finally he had the Smith boy drive the police car and he drove her car to the courthouse. The officer said when defendant got out of the car, "She couldn't walk straight. She had to lean against the car." He took her arm and helped her into the sheriff's office and sat her down in the chair. He also said, "She was jabbering quite a bit but it didn't make much sense," and, "There was nothing tangible in what she was saying."

She was booked in at the sheriff's office at 7:40 p. m. for drunk driving. Deputy Cobb made out the arrest card and testified that while defendant was continually talking and kidding, "She spoke quite intelligently" and was not like most drunks that are brought in. The sheriff said he also talked to her at that time and "her speech was very clear. It wasn't slurred." At about 9:00 p. m. defendant's husband arrived and put up bond; then defendant

was released. They started for Sinclair in their car. According to the defendant the deceased stopped the car on the way and defendant got out and tried to "flag" down a car to take her back to Rawlins. This is verified by a call to the sheriff's office at 9:20 p. m. Defendant met with no success and got into the back seat of the car. While defendant does not remember having taken a drink on the way, the half-filled bottle of whiskey was there so far as the evidence shows.

. When the couple arrived at their home in Sinclair about 9:30 p. m. their next-door neighbor, Lois Smith, was in her yard and observed defendant getting out of the car. As she rather vividly described it, the defendant climbed out of the car; "supported herself for a minute"; and then "aimed herself for the house and took off." She staggered on the way. Within some fifteen minutes defendant had shot her husband, and the sheriff and Leonard Meacham, the warden of the penitentiary, arrived on the scene.

After a brief conversation with the wounded husband, the sheriff went into the house and told defendant "she was under arrest for shooting her husband." The sheriff said defendant was nervous and talkative but he did not smell alcohol. Later he said she had been drinking but was not "intoxicated." The witness Meacham said it was apparent to him that defendant had been drinking; that her breath had a "pronounced odor" but her speech "was very good actually"; and that she seemed to be steady on her feet and wasn't "staggering." At 10:05 p. m. defendant was again booked in at the sheriff's office, and according to the arrest card was charged with "2nd Degree Murder," which later was changed to "1st" Degree. While it is true the sheriff testified that the "charge" portion of the card was left blank at that time, his testimony discloses that his recollection of the matter was not clear. He first said the second degree charge was typed in by mistake of the radio operator, Deputy Cobb, and that the change by inter-

lineation was made the next morning. Cobb, when called by the State, testified that the card was made out by him when the defendant was brought in and he said nothing about leaving any blanks on the card.

At 10:52 p. m. Miss Sanchez, the sheriff's secretary, accompanied the sheriff up to the kitchen in the jail where the statement was taken. She hadn't seen defendant when they brought her in and defendant was in a cell. She testified the sheriff brought the defendant out of the cell and took her into the kitchen. When asked if she observed defendant's condition as to sobriety she answered, "I don't know what that means, sir." When asked what she observed, she said defendant was nervous, was shaky, and "Seemed like she had been crying," and that "I did not know she had been drinking. She did not seem to be drunk at that time." She stated, "She walked perfectly well I think."

A psychiatrist called by the defense testified on cross-examination that "There is evidence in her history of drinking since her teens, and there is evidence of drinking for two or three days duration and a sort of irresponsible, don't care what happens manner."

From the foregoing it can be seen that even the matter of defendant's intoxication was indeed a close question. Assuming, however, that the trier of the facts was nevertheless entitled to find that the defendant, at the time the statement was taken, was not "drunk" or "intoxicated" in the usual sense in which those terms are used, that to me does not furnish a completely satisfactory answer to the precise question before us. There remains to be determined the question of whether or not the defendant, apparently afflicted with alcoholism, was capable after the consumption of alcohol over the lengthy period of time shown of forming a rational judgment with respect to the exercise of the rights accorded her by the Constitution of the United States and the consequences of foregoing the assertion of those rights.

That she was seems highly improbable, as I view it.

In the first instance the record does not show that defendant was ever before seriously involved in criminal matters or with the police or that she had any understanding of such matters. Thus, her undenied statement that she promptly fell asleep under the circumstances in which she found herself when placed in a cell and was awakened for purposes of making the statement is scarcely indicative of a person fully aware of all that her surroundings entailed. Bear in mind, also, the additional factor that she was simply asked for a statement "pertaining to the incident." She was not told prior to the completion of the statement that her husband was dead, which surely became known to the authorities between 10:15 p. m., the time of death, and 10:52 p. m., and that she was booked into jail for his murder.

Under all of the circumstances, I am unable to agree that the State's showing was sufficient to establish that the statement taken was voluntary and proceeded "from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause." State v. Jones, 73 Wyo. 122, 276 P.2d 445, 455.

I would reverse the judgment and grant a new trial.