THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

ALBERT E. BRUNER,

*Defendant and Appellant.*

(No. 2798; January 7. 1958; 319 Pac. (2d) 863.)

For the defendant and appellant the cause was submitted upon the brief and also oral argument of G. R. McConnell and Walter Scott both of Laramie, Wyoming.

For the plaintiff and respondent the cause was submitted upon the brief of Thomas O. Miller, Attorney General, and Ralph M. Kirsch, Assistant Attorney General, both of Cheyenne, Wyoming, and oral argument of Mr. Kirsch.

Heard before Blume, C. J., and Harnsberger and Parker, J. J.

114

116

## OPINION

Mr. Chief Justice BLUME delivered the opinion of the court.

Albert E. Bruner, the defendant and appellant herein, was convicted by a jury in the District Court of Albany County, Wyoming, of murder in the second degree for killing his wife, Blanche Douglas Bruner. He was sentenced to confinement in the penitentiary for a period of twenty to twenty-five years. From that conviction and sentence he has appealed to this court.

I. Counsel for the defendant contend that the defendant was not rightly convicted and taken into custody on account of the fact that the informations in the court of a justice of peace and in the district court charging the defendant with murder in the first degree were merely sworn to on an information and belief. Counsel made motions to quash the information and warrant for the arrest of the defendant. The first motion was sustained. When the second information was filed in the justice's court and a warrant for the arrest of the defendant was issued, the motion to quash was overruled and that was true also as to the motion to quash the information filed in the district court. Counsel for the defendant assign these rulings as error.

Courts are not in harmony on the subject before us. See 22 C.J.S., Criminal Law, § 309, p. 462; 42 C.J.S., Indictments and Informations, § 86, pp. 947, 951. Section 10-604, W.C.S. 1945, provides that when the information in any case is verified by the county and prosecuting attorney, it shall be sufficient if the verification shall be on an information and belief. Counsel for the defendant, however, contend that this statute is not controlling in view of the fact that § 4 of Article I of our constitution provides:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."

Counsel say that an information based only on information and belief does not state facts showing probable cause as required by the constitution. They cite us a number of cases decided in this court. State v. Boulter, 5 Wyo. 236, 39 P. 883, is hardly in point. It merely deals with an information filed in the district court for a higher degree of offense than that found by the justice of the peace. Furthermore, our statutory provision above mentioned was not discussed. State v. Peterson, 27 Wyo. 185, 194 P. 342, 13 A.L.R. 1284, is distinguishable by reason of the fact that in that case the information was verified by a private individual instead of the prosecuting attorney. In Hollibaugh v. Hehn, 13 Wyo. 269, 79 P. 1044, it was held that an information by the prosecuting attorney upon information and belief is sufficient for all purposes except issuing a warrant for defendant's arrest.

We do not think that it is necessary in this case to make an exhaustive research of the subject before us. When the second information in this case was filed before the justice of the peace, the prosecuting attorney also filed an affidavit. In that affidavit he stated in positive terms many of the facts which were subsequently brought out in the trial of the case. These facts so stated in positive terms were facts showing probable cause that the defendant was guilty of killing the deceased and consequently were sufficient in connection with the information to show probable grounds for arresting the defendant and taking him in custody. A hearing was had before the justice of the peace. He found that probable cause existed to believe the defendant guilty as charged. The information in this case filed in the district court on September 7, 1956, was sworn to by the county and prosecuting attorney to the effect that he had been reliably informed and verily believed the facts stated to be true. That was sufficient verification to hold the defendant in view of the findings of the justice of the peace. Brown v. People, 20 Colo. 161, 36 P. 1040; In re Boulter, 5 Wyo. 329, 40 P. 520, 524; Washburn v. People, 10 Mich. 372.

The foregoing assignment of errors is accordingly overruled.

II. The defendant in this case testified that he called up the train crew dispatcher at Cheyenne about five-thirty on the morning of May 25, 1956. To show that he was in error, the state called Marion E. Babcock, train crew dispatcher at Cheyenne. She testified that she made a note of the calls made to her; so the counsel for the defendant objected to her oral testimony, claiming that the notes made by her were the best evidence. The objection was overruled and this is assigned as

error. It is stated in 2 Wharton's Criminal Evidence, 12th ed., p. 501, as follows:

"When the fact as to which evidence is sought to be adduced is one that may have been observed by a witness, then his testimony regarding what he has seen or heard is primary evidence, regardless of whether such fact is reduced to writing and incorporated in a record or document because the witness testifies, not as to what the writing contains, but as to what he observed."

A case close in point herein is Kilpatrick v. Kilpatrick, 123 Conn. 218, 193 A. 765, 768. In that case a witness had overheard a conversation and at least part of the testimony was recorded on discs. The witness was permitted to testify to the conversation, and it was objected that that was not the best evidence. The supreme court said on that point as follows:

"* * * The plaintiff's contention that under the best evidence rule, the discs themselves were the only proper evidence of this conversation, apparently was not seriously urged, for shortly after, when the defendant did offer these discs in evidence, the plaintiff objected because they were not complete. Obviously the fact that a part of the conversation which Naylor heard over the earphones was at the same time mechanically recorded, did not affect the admissibility of his testimony of what he in fact heard. However, the court did not err in subsequently admitting the discs themselves as exhibits, for whatever corroboration they might afford."

We think that these authorities clearly show that the error assigned is not well taken and it is, accordingly, overruled.

III. The defendant asked the court to give the following instruction:

"The Court instructs the jury that where a man is charged with the homicide of his wife there is a strong presumption of innocence arising from the existence of the marital relation in addition to the legal presumption of innocence that exists in all cases where a person is accused of crime."

The court refused the instruction and it is charged herein that that was error. The record fails to show that any exception was taken to the refusal of the court to give the instruction, so that it is hardly necessary to take note of the assignment of error. We may, however, mention the fact that the presumption mentioned in the refused instruction finds strong support in State v. Watkins, 9 Conn. 47, 21 Am.Dec. 712; State v. Green, 35 Conn. 203; and see People of the State of New York v. Greenfield, 23 Hun 454, 465, affirmed 85 N.Y. 75, 39 Am.Rep. 636; 40 C.J.S., Homicide, § 198, p. 1098, nn. 40, 41. It seems that presumption was also held to exist in some of the earlier Missouri cases; but these cases were overruled in the case of State v. Soper, 148 Mo. 217, 49 S.W. 1007, 1011. In that case the court said, speaking of the earlier cases:

"* * * I think both of these cases should be overruled. If they are to stand, it would result, and logically follow, that such doctrine must necessarily be extended to every near blood relation of the immediate family of the person accused. No reason exists why it should not, and every one why it should, be thus extended. There is no more reason why a married man accused of the murder of his wife should have this two-ply presumption thrown around him, than a single man charged with the murder of his sister, or his brother, father, or mother. Whence I conclude that an old-fashioned one-ply presumption of innocence is amply sufficient for all practical purposes of the administration of the criminal law."

And in Hawes v. State, 88 Ala. 37, 7 So. 302, 314, the Supreme Court of Alabama said as follows:

"The law presumes innocence of crime in all cases until the contrary is shown. But we know of no principle upon which to this general presumption of innocence, other presumptions, depending on the relations which the alleged criminal bore to the victims of the crime, could be added. If a man, in addition to the general presumption, is entitled to further protect himself from punishment by a presumption of affection for his daughter, we see no reason why the principle may not be extended to other relatives indefinitely, and to his friends, and even to mankind at large, upon evidence of his kindly and affectionate disposition, or relations general and special, thus multiplying the issues without limit, and confusing the jury. Such is not the law. The presumption is single, and the same in all cases, and in all must be overturned by evidence which excludes every other reasonable hypothesis than that of guilt. Beyond this, whatever the relations of the alleged author and the victim of the act charged, the prosecution need not go. * * *"

The same view seems to be taken in Texas and Louisiana. A like view has been taken by the Supreme Court of Iowa in State v. Meyer, 180 Iowa 210, 163 N.W. 244, 247. However, in that case, while the court refused to give an instruction on the presumption, the trial court told the jury to " 'consider the relationship existing between defendant and the deceased; the known instinct or propensities of husband to love and protect their wives.' " Apparently the supreme court approved of that instruction, and it may be that in some cases at least such instruction could be proper. We do not think that in this case the refusal to give the instruction asked as above mentioned harmed the defendant in any way, as may be noted from the discussion which follows herein.

IV. The defendant at the close of the evidence of the state and again at the close of all of the evidence made a motion for a directed verdict of not guilty in favor

124

of the defendant. The motions were overruled. Counsel for the defendant now argue at great length that the evidence in the case is insufficient to show that the defendant is guilty of any crime. It is necessary, accordingly, to set out the evidence in the case insofar as it seems to be important.

The deceased managed an apartment hotel on the second floor of the so-called Hoppe Hotel; she was found dead about eleven o'clock on the morning of May 25, 1956, by some police officers whose attention had been called to the fact that there was something wrong in the Hoppe Hotel; she was found dead in the bedroom of her own apartment. The police officers had to break in a door to get into it. That bedroom was located on the southwest corner of the hotel. The deceased was lying on a so-called hospital bed about thirty-two inches high and thirty-two inches wide, located in the northeast corner of the bedroom. She was lying on her right side, the north end of the bed being a little higher than the remainder of the bed. Across her body was lying a rifle which had a strap on it. The stock of the rifle was lying close to the head of the deceased, the barrel pointing at her feet. Her left hand was up on the pillow about even with her face. Her right hand was along side of the rifle which was cradled across her. Two fingers were apparently in the strap. Her right leg was extended on the bed and the left leg was over the side of the bed. The strap was between the middle and third fingers, and a bunch of keys was in her right hand which was almost closed. The covers on the bed partly covered the body from the point near the shoulder down below her knees. There was a puncture wound in the head where a bullet had entered the left temple side of the skull just back of and above the corner of the left eye. According to the testimony of Dr. Zuckerman, who performed the au-

topsy, the bullet from a .22 rifle literally blew the skull apart; and she was never conscious thereafter. The bullet passed somewhat downward and fell out of the skull on the right side when it was opened by Dr. Zuckerman. It was the opinion of Dr. Zuckerman that when the deceased was shot the barrel of the gun was tight against her skin. There was a little blood around the bullet wound but she was not bleeding when she was found and the bleeding had not been profuse. No fingerprints were found on the rifle when it was examined subsequently. There was a second bed in the southwest part of the bedroom which was an ordinary bed, and on which Albert Bruner, the defendant in this case, was lying at the time when the police officers entered the room. The beds were about seven feet apart. An empty shell case was found twenty-seven inches from the hospital bed. The defendant was in pain at that time. He had been shot in the chest and was taken to the hospital almost immediately, and was under care in the hospital for a number of weeks thereafter. His shirt and his bedding were bloody.

It is the theory of the state that the deceased was shot by the defendant and that he thereafter shot himself in order to ward off any suspicion from himself as being the party who shot the deceased. It is the contention of the defendant that the deceased shot him and thereafter killed herself.

The defendant was a brakeman on the Union Pacific Railroad. He had formerly been married to Ina Bruner. This marriage was dissolved on March 27, 1956. The former wife stated that this was on account of the fact that he had become intimate with the deceased, Blanche Douglas. After the divorce, he married the deceased. This was sometime in April 1956.

The defendant acted as brakeman between Cheyenne and Laramie, going from east to west. This required him to "deadhead" from Laramie to Cheyenne. As before stated, he arrived in Laramie about three-thirty to four o'clock on the afternoon of May 24, 1956, and was in the Buckhorn Bar with the deceased. During the evening of that day the deceased was in company with one Wilma Read, a close friend of hers. According to the testimony of the latter, she and the deceased were at the Hoppe Hotel about 11 p.m.; that at that time they opened the door to Room 19 in the Hoppe Hotel; and that the defendant Bruner was asleep in that room, which was a sort of storeroom but with a cot or bed in it. The witness and the deceased then went to the Silver Leaf Bar and, with the exception of short intervals, were at that bar until about four o'clock on the morning of May 25th. They were in company with George William Tripplet and one Comstock, drinking whiskey and beer at the bar. About four o'clock they went to get something to eat but upon finding the restaurant closed went up to Room 16 of the Hoppe Hotel which was close to the apartment of the deceased. The deceased stayed about twenty minutes in that room and then went to her own apartment, the others remaining there for a period of time. Tripplet testified that he went to sleep part of the time and woke up about eight to nine o'clock on the morning of May 25th. When he woke up he went to go to the washroom. The door at that time was closed and he waited until the party who was in the room should come out. The defendant came out and the witness talked with him. He mentioned the fact that there had been a party in Room 16 and asked the defendant not to feel bad about it, for they always had been friends and should remain so, and that the defendant at that time mentioned the fact that it was all right. He stated that Bruner was dressed but didn't know

whether he had shoes on or not; that after the defendant left the washroom he went down the hall to the apartment. The witness asked him where he was going and the defendant answered that he was called to work right away. Thereafter the witness went back to Room 16. Soon thereafter he heard a door slam; went to the door of the manager's apartment, that is to say the apartment of the deceased; and knocked on the door. The kitchen lights were on. The defendant Bruner came to the door and the witness asked Bruner if everything was all right. The defendant answered, "Everything is all right, Bill". The defendant opened the door about ten or twelve inches. The witness thereafter went to bed and heard no undue noises. When he saw the defendant he saw no blood on the defendant's shirt. The testimony of this wisness was in direct conflict with the statement made by defendant and hereafter set forth.

The witness, Marion E. Babcock, train crew dispatcher at Cheyenne, testified the defendant called her up about four-fifteen on the morning of May 25th and wanted to know if there was an extra man who might take the defendant's place in acting as brakeman on the railroad that morning; that the defendant again called her up at six o'clock on that morning and then told the witness that he would be right over to Cheyenne. This testimony, too, is in conflict with defendant's statement.

Dr. Pavy testified that the deceased came to her death about four to six hours before she was found, with a possible leeway of one hour each way.

On May 27th the defendant Bruner, after being duly warned of his rights, made a statement in the presence of the sheriff of Albany County, Wyoming, and

the county and prosecuting attorney. He stated in substance as follows: When he returned from Cheyenne on the afternoon of May 24, 1956, the deceased in some way had found out that the defendant had borrowed two dollars from his former wife, Ina, from whom he was divorced, and had eaten a lunch at the same place with her; that the deceased was angry and had some argument with him in that connection on the afternoon of May 24th, as well as in the evening. They were at the Buckhorn Bar sometime during the evening and left there sometime after ten o'clock. When he and the deceased arrived at the apartment in the Hoppe Hotel around midnight, the deceased wanted him to move out and leave at once. He thereupon went into Room 19, which was right across the hall from the apartment of the deceased, and went to sleep, waking up about five o'clock the next morning, at which time he called the yard office at Cheyenne to find out when he would be called upon to come to Cheyenne and go on duty as brakeman. He then went into the apartment. The deceased was still up at that time and in the kitchen. She again commenced to argue as she had previously. They finally went into the bedroom. She paraded up and down. Defendant sat on the edge of the bed and deceased kept talking about the defendant lying about the two dollars, but defendant told her that he didn't lie about it. She then went into the other room and came back with a .22 rifle. The rifle belonged to the deceased and she had frequently used it previously. The deceased then told the defendant, "Take these pills. I'm going to kill you". In order to avoid any trouble he took the pills, a whole bottle full, thinking that they could not kill him and that in any event he could see a physician in connection with that. After he had taken the pills, the deceased said, "I am going to shoot you anyway". The defendant himself tried to smooth her temper. He

didn't think there was any shell in the rifle, since she had always been particular about taking the shells out. But she finally pulled the trigger. Defendant felt a hot flash and that is all he remembers about it. He woke up about ten or ten-thirty on the morning of May 25th and tried to call the attention of some people outside the hotel, and the police officers finally arrived.

On May 28th he made an additional statement. The sheriff, in the meantime, had found a new note which the defendant apparently had left on the table in the kitchen of the apartment. This note apparently read as follows: "Please see that Linda gets my fish and wristwatch and the boys get my clothes". The sheriff construed this to be a suicide note but the defendant denied that and claimed that it was written because he was going to be on a trip away from Laramie.

Some additional facts will be mentioned hereafter.

The case before us is a strange case. To reconstruct the manner in which the death of the deceased occurred is impossible or well nigh so. The state's brief, unfortunately, has given us little, if any, aid. Contrary to the contention of counsel for defendant, the jury were not required to accept the explanation of the defendant, especially in the face of the testimony of the witness George William Tripplet; and while that witness himself admitted that he was drunk, still it was the function of the jury to give his testimony such credence as it deserved. The defendant was the only other person in the room with the deceased when the killing took place. The contention of counsel for the defendant that someone else might have entered the room and killed the deceased while the defendant was lying on his bed unconscious is too conjectural to de-

130

serve any credence. There is not the slightest circumstance shown which would support such conjecture. The position of the body of the deceased as she was found by the police officers and the position of the rifle across her body made it substantially impossible for her to have killed herself while on the bed. As pointed out in the statement of the facts, the deceased lay on her right side, with the butt of the gun near her head, and the barrel at the foot of the bed, near her feet. If she had killed herself, the barrel would necessarily have been pointed toward her head. According to Dr. Zuckerman she became unconscious immediately after being shot. It would then have been impossible for her to turn the rifle around, putting the barrel to the foot of the bed.

She was either killed by the defendant while on the bed or, if she was dead before getting on the bed, defendant, since he was the only other person in the room, put her there. If, on the other hand, deceased shot the defendant and then killed herself while on the floor, we are faced with the question as to how she got on the bed. Obviously she could not then get on the bed by herself, and the defendant must have put her there. The evidence is clear that the rifle was in fact used since the deceased was killed by a bullet from it. But no fingerprints were found on the rifle. Since the deceased became unconscious immediately after being shot, she could not wipe the fingerprints from the gun, and the defendant must have done so. Hence the very least of which the defendant was guilty was the fabrication of false testimony. That throws doubt on his statements; and as stated in 22 C.J.S., Criminal Law, § 633, pp. 966-968:

"Fraud on the part of accused * * * such as * * * fabrication of evidence * * * or to fabricate * * * false evi-

dence, may be shown against him as an incriminating circumstance, inconsistent with innocence, and as tending to show a consciousness of guilt * * *."

The statement of defendant that deceased made him swallow a whole bottle of sleeping medicine taxes the credulity of men. We can perceive no purpose in it. It is wholly inconsistent with the statement that she wanted him to leave the apartment at once. Defendant stated that he lost consciousness at once after being shot, while Dr. DeKay stated that he did not see "anything from the bullet wound itself that would make him lose consciousness." Counsel for the defendant, to sustain their contention, make much of the fact that no blood was found on the floor; but we do not see the importance of that fact in view of the evidence that not much blood came from the wound inflicted on the deceased. We believe that the jury were justified in accepting the theory of the state, namely, that the defendant killed the deceased and subsequently shot himself in order to ward off any suspicion that he killed the deceased.

On the other hand we do not know, nor did the jury know, where the deceased was when she was shot. According to the testimony of Dr. Zuckerman, the muzzle of the gun was tight against the skin when she was shot. If she was on the bed when that was done that would seem to show a deliberate act of the defendant or possibly an act in a state of excitement and in the heat of passion. That would seem to be inconsistent with the character of the defendant and the manner in which he always treated the deceased as shown by the evidence and, perhaps, even inconsistent with the particular place where the bullet entered the brain of the deceased. It is more likely that deceased was shot while on the floor, that is to say, before she was put on the bed. How did it happen that the

muzzle of the gun was close to the skin when deceased was killed, as testified to by Dr. Zuckerman? Possibly by reason of the struggle for the possession of the rifle, possibly by accident. We do not know, nor did the jury know. There is no evidence in the record that shows the facts. So while we cannot agree with counsel for the defendant that he is not guilty at all, we are still confronted with the question as to the extent to which the verdict of the jury can be upheld, that is to say, as to whether or not the jury were justified in finding the defendant guilty of murder in the second degree. The question is so fundamental that it is impossible for us to overlook it.

We find no motive in the case. Surely the fact that the deceased in a moment of anger told him to leave the apartment is not sufficent to show a motive. We stated in Eagan v. State, 58 Wyo. 167, 128 P.2d 215, 228:

"* * * If the defendant is guilty of murder, we ought to be able to find a motive. Motive, it is true, is not essential * * * but it would seem that the absence in this case should have considerable influence in determining the degree of guilt. * * *"

Again, in order that the defendant may be found guilty of murder in the second degree, it is necessary, according to the provisions of § 9-204, W.C.S.1945, that the killing must be with malice.

The killing in this case was by a deadly weapon. Malice may at times be inferred from such use. 41 C.J.S., Homicide, § 316, p. 29. However, it is stated in 40 C.J.S., Homicide, § 25, pp. 876-877:

"In order that an implication of malice may arise from the use of a deadly weapon, it must appear that its

use was willful or intentional, deliberate, or wanton. * * *"

Unfortunately, its use in the case at bar is buried in obscurity. This court cannot, and neither could the jury, tell as to whether or not the weapon was used in one of the manners above indicated.

That deceased pestered, even bullied, the defendant as stated by the latter is not at all improbable. That would seem to be indicated if nothing more than by the fact that the defendant slept in Room 19, which was a sort of storage room, rather than in his own bed in the apartment. We do not know the significance, or at least the full significance, of the so-called suicide note found on the table in the kitchen. We do not know when it was placed there. If it was placed there before the deceased was killed, then it shows that he was gloomy and intended no harm to the deceased. If it was placed there after the deceased was killed, then it shows perhaps that he actually intended to kill himself. In that event, it shows, if anything, the extreme perturbed and confused state of mind rather than a malicious mind. Edith Tripplet, witness for the state, testified that the deceased acted as though she did not want him to touch her. The witness Puls testified to the same fact and further stated that she could kill the "s.o.b", meaning the defendant. The witness Stone testified that he heard the deceased calling the defendant a "lying s.o.b." and that the defendant merely said that he was not lying. A number of witnesses, including some for the state, indicated that the defendant drank intoxicating liquor moderately, while the testimony of the state indicates that she was drunk and had drunk immoderately during the night of May 24th to May 25th, and may have been in a vile and irascible mood on the morning of May 25, 1956. The

undisputed testimony shows that the defendant was of a quiet and peaceful disposition and that he always treated the deceased courteously, was always good to her and never abused her. One witness who had known the defendant for at least ten years stated that he never saw the defendant excited or angry. George William Tripplet stated that the defendant and the deceased always got along very well. There is no direct testimony that the defendant acted with malice in killing the deceased. The circumstances of the killing are unknown or at least merely conjectural. It is not improbable that the killing occurred in a struggle for the possession of the rifle or in the heat of passion. The state was bound to prove malice beyond a reasonable doubt. 41 C.J.S., Homicide, § 316, p. 29. No guess will suffice. We stated in the Eagan case, supra, at p. 225, that "if the evidence is as consistent with guilt of a lesser crime as it is with the guilt of a higher, the conviction should be of the lesser." We think that is the least we can say as to the existence of malice in the case. We, accordingly, find no alternative except to follow the pattern in State v. Sorrentino, 31 Wyo. 129, 224 P. 420, 34 A.L.R. 1477; 31 Wyo. 499, 228 P. 283, 34 A.L.R. 1487; State v. Flory, 40 Wyo. 184, 276 P. 458; Eagan v. State, 58 Wyo. 167, 128 P.2d 215; State v. Helton, 73 Wyo. 92, 276 P.2d 434. The verdict of the jury is set aside as to murder in the second degree, but is sustained as to manslaughter. The judgment of the trial court is set aside; and the trial court is directed to cause the defendant to be brought before it, and resentence him for manslaughter.