Billy James CLOMAN, a/k/a Billy James Kloman, Julian Pernell Turner, a/k/a William Coleman, a/k/a Willie Joseph Spotman, Appellants (Defendants below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 4489.

Supreme Court of Wyoming.

Jan. 31, 1978.

Byron Hirst, James L. Applegate, Douglas G. Madison, Scott Lewis, Hirst & Applegate, Cheyenne, for appellants.

V. Frank Mendicino, Atty. Gen., David A. Kern and William M. Sutton, Senior Asst. Attys. Gen., Timothy J. Judson and Arthur T. Hanscum, Asst. Attys. Gen., Cheyenne, for appellee.

Before GUTHRIE, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and ARMSTRONG, District Judge, Retired.

PER CURIAM.

Billy James Cloman and Julian Pernell Turner appeal from death sentences imposed by the district court of Albany County, Wyoming, after return of four separate guilty verdicts relating to the deaths of Lloyd Witt and Ray Davis, residents of Laramie County, Wyoming. Among other assignments of error the defendants attack the constitutionality of those provisions of the statute mandating the death penalty in first degree murder convictions.

■ On August 10, 1974, the date the verdicts were rendered the relevant parts of § 6–54, W.S.1957, 1975 Cum.Supp., read as follows:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree.

"(b) Upon conviction of murder in the first degree, a mandatory sentence of death in the manner provided by law shall be imposed if the trier of fact finds the offense involves the following course of conduct:

  *     *     *     *     *     *

"(vii) Murder of any person perpetrated in the course of a kidnapping;

  *     *     *     *     *     *

"(x) Murder of two or more persons in one series of related events.

  *     *     *     *     *     *

"(e) Upon conviction of murder in the first degree, if the offense does not involve a course of conduct as described in subsection (b) of this section, the person convicted shall be sentenced to imprisonment for life.
"  *     *     *   * "

The severability clause enacted in conjunction with § 6–54, found in Sec. 2, Ch. 136, S.L. Wyoming 1973, provides:

"If any provisions of this act or the application thereof to any person or circumstances, including any one or more of the above enumerated instances in which a mandatory sentence of death shall be imposed, is held unconstitutional or otherwise invalid, such unconstitutionality or invalidity shall not affect any other provisions or applications of this act, and to this end the provisions of this act are declared severable."

It was held by this court in *Kennedy v. State,* 559 P.2d 1014 (Wyo.1977), that the mandatory sentence prescribed in § 6–54(b) was unconstitutional, but by applying the severability clause to § 6–54(e) so that it read "Upon conviction of murder in the first degree, the person convicted shall be sentenced to imprisonment for life," the defendants there were to be resentenced to life imprisonment. We shall remand this case for similar sentencing. *Anderson v. State,* 267 So.2d 8 (Fla.1972).

The defendants also attack the verdicts as being so ambiguous, indefinite and prejudicial that their convictions must be reversed as plain error.

Each defendant was found guilty of murdering each victim by separate verdicts which read the same except for name changes. One reads:

"We, the jury, duly empanelled and sworn to try the above entitled cause, do find the defendant, Billy James Cloman,

COUNT I

"1. ( ) Not Guilty of the crime of Murder in the First Degree of Lloyd Witt in the course of a kidnapping, or the Murder of Lloyd Witt and one or more other

person(s) in one series of related events as instructed in Instruction No. 12;

(X) Guilty of the crime of Murder in the First Degree of Lloyd Witt in the course of a kidnapping, *or* the Murder of Lloyd Witt and one or more other person(s) in one series of related events as instructed in Instruction No. 12;

\* \* \* "

When the words of aggravating conduct are severed from the verdicts, they read: "(X) Guilty of the crime of Murder in the First Degree of Lloyd Witt [Ray Davis] as instructed in Instruction No. 12."

Instruction No. 12 reads in part:

"I. MURDER IN THE FIRST DE-GREE WITH SPECIAL CIRCUMSTANC-ES.

A. MURDER IN THE FIRST DEGREE DURING THE COURSE OF A KID-NAPPING.

1. That the deceased, Lloyd Witt and Ray Davis came to their death on or about the 27th of December 1973;

2. That they were killed by the defendants charged;

3. That the killing was done purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate a robbery;

4. That the crime was committed in Laramie County, Wyoming;

5. That the killing was done during the course of a kidnapping;

6. That each defendant did aid and abet the other defendant in the murder with premeditated malice of Lloyd Witt and Ray Davis, or that each defendant did aid and abet the other defendant in the murder of Lloyd Witt and Ray Davis in the perpetration of, or attempt to perpetrate a robbery."

Paragraph B of the Instruction reads the same except it refers to murder in the first degree of two or more persons in a series of related events. Deleting the fifth paragraph of the Instruction, thus avoiding the unconstitutional aggravating circumstances, i. e. kidnapping and in a series of related events (§ 6–54(b)(vii) and (x)), it is observed

that all of the essential elements of § 6–54(a) are retained. Included in the retention is paragraph 3, that the killing was done purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate a robbery.

After excising paragraph 5 in the Instruction, there still remains a disjunctive. Did the jury find evidence of premeditated murder or felony-murder in the commission of a robbery, or both?

The "proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1956).

The dilemma in *Yates* is not present in this case. As the court said in *United States v. Natelli,* 527 F.2d 311, 325 (2d Cir. 1975), cert. den. 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 829:

" \* \* \* Inasmuch as the evidence was sufficient to support Natelli's conviction on either specification, the charge given presents no problem to affirmance as to him."

In other words, this court is convinced that the facts in evidence and the reasonable inferences therefrom amply justified the holding that the jury found both premeditated murder and felony-murder in the commission of a robbery. To substantiate that, and the *Natelli* statement, a review of some of the facts in this record is necessary.

### FACTS

The partially frozen bodies of Witt and Davis were discovered at about 9:30 a. m. on the morning of December 28, 1973, some 33 hours after they had left the Witt residence accompanied by two men clearly identified as the two defendants. The four men left the Witt residence between 1:00 and 1:15 a. m. in the early morning of December 27, 1973, in a truck owned by Witt, the purpose of the trip being to take the two defendants to a motel in Cheyenne,

Wyoming. At this time Witt told his wife that "I will be back as soon as I possibly can." So far as the record discloses no one except the defendants ever saw Witt and Davis alive after that moment. Their bodies were found after an extensive search at a point some two and one-half miles west of the Witt home, which home is some 12 miles east of Cheyenne, not far from U.S. Highway Interstate 80. Each body bore as many as a dozen stab wounds, several of which in each body were testified to by the examining pathologist as sufficient to cause death. He testified that the cause of both deaths was "stab wounds of both lungs, accompanied by severe intra pulmonary hemor[rh]age."

According to Mrs. Witt the two defendants entered the Witt home, in separate intervals, and as she recalled without knocking, at about 11:30 p. m. on the evening of December 26. Both complained that it was bitterly cold outside, that their car had broken down and that they had walked a good many miles. In an in-court identification of the two defendants Mrs. Witt described both men as wet and cold and particularly the one she identified as Cloman as "cold. He was bedraggled, acted like he was on his last legs." The two men told the Witts that the automobile in which they had been proceeding westerly to Oregon had broken down some distance to the east of the Witt house and that they wanted to find a motel where they could spend the night. To a question by Witt whether they should not call a wrecker, the men replied that that could wait until morning. Actually, and as well established by independent evidence, defendants had left Portland, Oregon, about a week and a half before Christmas, in a 1964 Pontiac, with a fourteen-year-old female companion who testified at the trial. According to her testimony, the three had left Portland intending to go only to Salem, some 50 miles distant, but they kept going until their car broke down at a point near Heber City, Utah, where they either abandoned it or it was removed from the highway in their absence. In any event they had no car on the night in question. At this stage of their travel they were befriended by a passing truck driver who lived in the vicinity and who furnished them with food, a couple of nights' lodging and assisted them in finding a ride into Vail, Colorado, from which point they hitchhiked on in to Denver, Colorado, where they visited a girl known to one of the defendants. The witness' connection with the trip ended in Denver when she was taken into custody by juvenile authorities. Defendants then continued to Cheyenne, Wyoming, in part by bus, but hitchhiking the rest of the way when the bus broke down. In Cheyenne they ate, played a little pool and tried to hitch a ride on to the east but without success. They then walked the some twelve miles to the Witt residence, entered and succeeded in getting Mr. Witt and his friend Davis to commence the ill-fated journey.

At about 11:30 p. m. on the night of December 27, 22½ hours after the truck in which the four men had left the Witt home, the defendants were stopped in Chicago, Illinois (969 miles from Cheyenne), by two police officers of that city, Kenneth R. Fowler and Raul Flores, after Turner, then driving, had made an illegal right turn in front of and across the traffic lane occupied by their patrol car. Officer Fowler advised the two men that a traffic citation would be issued and that they would have to follow the officers to a nearby district police station to post bond. When requested to produce his driver's license Turner handed Fowler an Oregon license issued to Billy James Cloman and also gave him a Wyoming vehicle registration certificate issued in the name of Lloyd Witt but bearing the signature, "Julian P. Turner, Jr." A check into the ownership of the vehicle was instituted by radio request and the defendants were requested to get into the back seat of the patrol car, prior to which a pat-down search was made of both men and a black-handled knife, to which further and more detailed reference will be made, was found in Cloman's jacket.

While comparing the registration slip furnished by Turner with a card found in the cab of the truck, Flores saw a neatly folded

Juicy Fruit chewing gum wrapper on the floor of the truck. Opening it he found a powder which he, based upon training in the field of narcotics, thought to be heroin, and he thereupon returned to the patrol car and placed the two defendants, sitting in the back seat thereof, under arrest for illegal possession of controlled substances. It was later determined that the contents were not controlled substances.

The officers then took the defendants in the patrol car to the district police station and the truck was driven to the same place by another police officer. The defendants were booked on the possession charge, their clothing was taken from them and eventually turned over to the FBI for examination. During the course of the night of their arrest Chicago police contacted Cheyenne police who confirmed Witt's ownership of the truck and advised that Witt and Davis were missing, having last been seen in the company of two Negroes. The defendants were subsequently returned to Cheyenne after indictments for first degree murder were returned against them by a grand jury in Laramie County.

While walking from the patrol car to the station to which the defendants were first taken officer Flores looked in the truck bed and noticed what he believed to be blood stains. The truck was driven to a police garage where mobile lab technicians of the police department took photographs and took scrapings of red substances found at different places in the truck. These were turned over to what was described as the micro section of the Chicago police force for analysis.

The truck was further examined by agents of the FBI on January 3, 1974, and at that time a hat, later identified as having been worn by Turner at the Witt house, and a black glove for the right hand were removed from the cab and a scraping of a red substance was taken from the tailgate of the truck.

There is no direct evidence as to the movements of the defendants between the time they left the Witt home and their appearance in Chicago. However, on the morning of December 27, 1973, a red fuel tank with hose and pump attached, identified by Mrs. Witt as having been on the Witt truck the night that he left home, was found in a rancher's field near Sidney, Nebraska, a city which is located on U.S. Highway Interstate 80, between Cheyenne and Chicago. At the same time and place there was found a grey coat, identified at the trial as the one worn by Turner in the Witt home on December 26. Certain materials found in this coat and scrapings of a substance found on the coat were turned over to the FBI for examination.

Loose material found in the Turner coat included employment identification cards for Ron Mortenson, the truck driver who had befriended the three travelers at the time of their breakdown in Utah and who testified that he had given the cards to the two men to assist them in hitchhiking after they had abandoned or lost their automobile. A piece of paper containing a name and address was also found in the coat and through testimony of Dr. James Booker, director of the Wyoming State Crime Laboratory, was identified as having come from a notebook which was found on Turner when the Chicago officers took the defendants' clothing and personal effects.

The red substance scraped from Turner's coat was analyzed by the FBI and identified as human blood type O. Similar type O blood was found on the jacket and pants worn by Turner which were taken from him in Chicago. A pair of blue jeans removed from Cloman contained human blood, type O. Scrapings from the threshold on the driver's side of the truck, and from the right rear wheel well, taken by the Chicago police in their examination of the truck in the early morning of December 28, were analyzed and found to be human blood, type O. Similarly, the scraping made by FBI officers from the tailgate of the truck on January 3, 1974, was analyzed and found to be human blood, type O. A scraping from the safety belt in the truck on the driver's side was determined to be human blood but in too limited quantity to determine the type.

In the course of his testimony the pathologist identified Witt's blood type as O, Rh negative and Davis' as type O, Rh positive. No testimony was given as to the Rh factor of any of the samplings. Evidence presented by the defense shows that Turner had type B blood and Cloman type O, with no showing as to the Rh factor.

A shirt which had been found on the body of Ray Davis, and an eyeglass case which had been found on the body of Lloyd Witt and was further identified as his by his widow, and both of which items show cut marks, were introduced in evidence. Dr. James Booker, director of the Wyoming State Crime Laboratory, after describing the knife was permitted over objection to testify that he had made cuts in cloth and paper using this knife and had compared those with the cuts made in Mr. Davis' shirt and that "[t]he cuts in the test cloth and paper were similar in size, shape, to the cuts in the cloth of the shirt." He also testified concerning similar cut experiments made with the knife into modeling clay, but upon objection by defendant that this was a material different from the plastic eyeglass case was not permitted to make any comparisons. To the question whether he was able to state with certainty as to whether the knife "created the cuts which appear on the shirt which is State's Exhibit 36, and the eyeglass case which is State's Exhibit 55" his answer was "No."

A black glove for the left hand was identified by the county coroner as found either upon or with Lloyd Witt's body at the time he was removed to the mortuary. There is no evidence as to whether this glove was on his hand when he left the Witt residence. Visual comparison of the two exhibits convinces us that the jury could properly have found that the glove found in the truck was a mate to the glove found with Witt's body. Both gloves were offered in evidence, as Witt's gloves, and received without objection.

The only explanation given by the defendants for their possession of the truck was that Cloman had bought it from Witt, some time after leaving the Witt residence on a cold night at about 1:00 a. m., paying for it in cash; that Cloman, who had type O blood, had cut himself with a knife (a small cut is shown in a picture taken at the time of his arrest) which necessitated tearing a strip from his coat for a bandage; that this rendered the coat useless and it was thrown away. No reason was given for throwing away Turner's coat, bearing blood stains of the type of Witt and Davis, nor was any explanation given of the blood stains on the truck or on the victims' clothing.

There was no denial that the knife was in the possession of one of the defendants prior to contacting the victims; there was no evidence indicating that the deaths occurred in a sudden quarrel or heat of passion; there were no bruises on either defendant; the defendants chose a remote home for the purpose of seeking transportation rather than at homes or business places on a travelled highway; the testimony of defendant Cloman, brief as it was, was contradicted by other credible witnesses.

### RULES ON APPEAL

■ If there was a lack of substantial evidence to justify submission of any issue of guilt to the jury, whether it be the charge of purposeful killing with premeditated malice, or of felony murder, it was the duty of the trial court to remove such issue from their consideration. And upon the return of a verdict of guilty it is the duty of the trial judge "to determine if there was sufficient 'credible and competent evidence' to sustain the verdict." *O'Neal v. State*, 498 P.2d 1232, 1234 (Wyo. 1972); *Smith v. State*, 564 P.2d 1194, 1198 (Wyo.1977).

In such case neither the trial judge, in ruling on the motion for judgment of acquittal, nor this court, considering the propriety of his action, is to be considered as a trier of the fact and

"Neither this court nor any trial court should ever substitute its opinion for that of the jury and a jury's finding of fact or a judge's refusal to grant a new trial should not be interfered with if there is any substantial evidence to support it,

* * *." *Reilly v. State,* 496 P.2d 899, 902 (Wyo.1972); *Johnson v. State,* 562 P.2d 1294, 1298 (Wyo.1977).

The trial court, when ruling on a motion for judgment of acquittal (Rule 30 W.R.Cr.P.), is called upon to determine, as a matter of law, whether in its opinion there is sufficient evidence to sustain the charges. On review, the supreme court has the same duty. *Montez v. State,* 527 P.2d 1330, 1332 (Wyo.1974); *Fresquez v. State,* 492 P.2d 197, 202 (Wyo.1971); *Heberling v. State,* 507 P.2d 1, 5 (Wyo.1973), cert. den., 414 U.S. 1022, 94 S.Ct. 444, 38 L.Ed.2d 313.

The supporting evidence may be circumstantial. In *Harris v. State,* 487 P.2d 800, 801 (Wyo.1971), we said that in reaching a conclusion as to the sufficiency of the evidence this court

"* * * must view the evidence in a light most favorable to the prosecution and determine questions of law as to whether there is substantial evidence, direct or circumstantial, or both, which, with the reasonable inferences that must be drawn therefrom, will sustain the verdict." See also *Cullin v. State,* 565 P.2d 445, 448 (Wyo.1977).

*Johnson v. State,* 562 P.2d 1294, 1297 (Wyo.1977) says this with regard to circumstantial evidence:

"Even though none of the circumstances standing alone might be sufficient to support a conviction, it has been said: '* * * The nature of circumstantial evidence implies the weaving of a fabric of known facts, which may be inconsequential alone, but become important when they are tied to other facts which lead to inevitable conclusions as to facts in issue. * * *' *Mathis v. People,* 167 Colo. 504, 448 P.2d 633, 637."

In *Dryden v. State,* 535 P.2d 483 (Wyo. 1975), we held that the circumstantial evidence there present was such that "a jury *could* find that defendant committed the [brutal] attack upon the decedent, and that [the beating] was done intentionally and with malice." (535 P.2d at 496).

For a recent discussion of circumstantial evidence, see *Blakely v. State,* 542 P.2d 857, 861 (Wyo.1975).

■ The inferences to be reasonably deduced from the facts and circumstances are questions for the jury to determine. The sufficiency of the evidence to warrant those inferences are questions of law for the courts. 88 C.J.S. Trial § 211, p. 470.

The federal test for the standard of evidence necessary for the trial judge to send a case to the jury is best stated by Judge Prettyman in *Curley v. United States,* 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. den., 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), as follows:

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. * * *" (footnotes omitted) [1]

1. The 2nd Circuit in 1944 in an opinion by Judge Learned Hand in *United States v. Feinberg,* 140 F.2d 592, 594 (cert. den.), held that the standard was the same in civil and criminal cases. That view was exhaustively challenged unsuccessfully in the concurring opinion by Judge Frank in 1956 in *United States v. Masiello,* 235 F.2d 279, 285 et seq. Not until 1972 in

*United States v. Taylor,* 464 F.2d 240, 244, did the 2nd Circuit put the finishing touches on *Feinberg* and embrace *Curley.* In *Taylor* the court said among many other things: "We in no way subscribe to the doctrine that 'where the Government's evidence is circumstantial it must be such as to exclude every reasonable

■ Those inferences cannot be the result of conjecture or surmise. There must be some connection between the proven fact and the inference drawn from it. *Harris v. Schoonmaker,* 50 Wyo. 119, 60 P.2d 360, 363 (1936); *Blakely v. State, supra.*

In summary, the rules discussed in the Wyoming cases above may be found in cases from a majority of other states. From a random selection, the following quotation from a 1976 Indiana case (*Duling v. State,* 354 N.E.2d 286, 290) exemplifies those rules:

> "When reviewing the sufficiency of the evidence, it is not the duty of this court to weigh the evidence or to determine the credibility of witnesses. This court looks to the evidence and reasonable inferences therefrom most supportive of the verdict, to determine if there is substantial evidence of probative value from which the trier of fact could reasonably infer that the defendant was guilty beyond a reasonable doubt. Circumstantial evidence is subject to a similar review which specifically requires that we view the evidence, not for the purpose of determining whether or not it is adequate to overcome every reasonable hypothesis of innocence, but with the same general view of deciding whether an inference may be reasonably drawn therefrom which tends to support the finding of the trial court. *Atkins v. State* (1974), 159 Ind.App. 387, 307 N.E.2d 73; *McAfee v. State* (1973), 259 Ind. 687, 291 N.E.2d 554; *Glover v. State* (1973), 157 Ind.App. 532, 300 N.E. 2d 902."

### PREMEDITATED MURDER

■ Applying those rules, we believe the recitation of facts and circumstances set out above, together with reasonable inferences therefrom, were substantial and justified the jury in finding defendants guilty beyond a reasonable doubt of premeditated murder. The trial court, therefore, properly denied defendants' motions for new trial and acquittal on this ground. *People v. Pearson,* 546 P.2d 1259 (Colo.1976).[2] *United States v. Brown,* 518 F.2d 821 (7th Cir. 1975), cert. den., 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975); *United States v. Esquer,* 459 F.2d 431 (7th Cir. 1972), cert. den., 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243; *State v. Smith,* 12 Wash.App. 720, 531 P.2d 843 (1975); Cf., *State v. Duke,* 110 Ariz. 320, 518 P.2d 570 (1974); *State v. Parker,* 113 Ariz. 560, 558 P.2d 905 (1976).

In *Clark v. State,* 558 P.2d 674, 678 (Okl. 1977) the court said:

> " * * * It has been repeatedly held by this Court that if the jury, in consideration of all the facts and circumstances, can reasonably and satisfactorily infer the existence of the premeditated design, they will be warranted in so doing, *Clouse v. State,* Okl.Cr., 389 P.2d 1002 (1964). The facts in the principal case reveal that two hostages were taken in a violent bank robbery, blindfolded and taken into an isolated building, and each shot twice. It is our position this presents sufficient facts from which the jury could find premeditation, and we therefore rule this contention to be without merit."

In *Dearman v. State,* 566 P.2d 407, 409 (Nev.1977), it is said:

> " * * * Intent to kill, as well as premeditation, may be ascertained or deduced from the facts and circumstances of the killing, such as use of a weapon calculated to produce death, the manner

---

hypothesis other than that of guilt.' " See also, *Cullin v. State,* 565 P.2d 445, 453 (Wyo.1977).

2. The Colorado court in this case found the following facts and inferences to be sufficient to sustain the conviction of first degree murder:
   " * * * The defendant was at the victim's apartment at the approximate time of the homicide. He was arrested while driving the victim's truck in New Mexico, the day following the homicide. He possessed the victim's complete set of keys and credit cards. Defendant's clothing was stained with the victim's type of blood. A search of defendant's motel room produced several items of property owned by the victim. Found on the seat of the victim's truck was a fishing knife taken from the victim's apartment which could have caused the mortal wounds to the victim." *People v. Pearson,* 546 P.2d 1259, 1268 (Colo.1976).

of use, and the attendant circumstances. See *Moser v. State,* 91 Nev. 809, 544 P.2d 424 (1975). * * * " See also *Smith v. State,* 564 P.2d 1194, 1198 (Wyo.1977).

In *Smith v. State, supra,* it says:

" * * * Malice may be inferred from the use of a deadly weapon in a dangerous and deadly manner if the facts and circumstances so allow. *Dodge v. State,* Wyo.1977, 562 P.2d 303; *State v. Bruner,* 1958, 78 Wyo. 111, 319 P.2d 863; *Eagan v. State,* 1942, 58 Wyo. 167, 128 P.2d 215. * * * "

1 Wharton's Criminal Law and Procedure by Anderson p. 563, et seq., states the rules of law on premeditation as follows:

"Deliberation and premeditation involve a *prior intention or design to do the act in* question. It is not necessary, however, that this intention should have been conceived at any particular period of time, and it is sufficient that only a moment elapsed between the plan and its execution, as long as the jury can conclude that there was some appreciable interval however small. It is sufficient that with the intention to commit the act the appreciation of the result likely to follow appeared to the defendant at the time the act was committed, or that he understood and contemplated the consequences of his act. A killing may be the result of prompt and speedy execution of a hasty or immediate resolution and yet have been done with express malice. When a design is once formed, the haste with which it is put into execution in no way affects or modifies the degree of guilt incurred. Such design may have existed for only an instant before the commission of the crime. [footnotes omitted]

"Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances of the case, such as the use of a deadly weapon upon an unarmed victim; * * * " (footnotes omitted)

In *State v. Riggle,* 76 Wyo. 1, 298 P.2d 349, 367 (1956), this court said the following instruction "stated the correct rule of law":

" 'It requires that there should be time and opportunity for deliberate thought, and that after the mind has conceived the thought of taking life, the thought is meditated upon and a deliberate determination formed to do the act. This being done, it makes no difference how soon afterwards the *fatal resolve is carried* into execution. There need be no specific period of time between the formation of the intention in the mind to kill and the killing so long as there was some time for deliberation.' "

Evidence of defendants' premeditation in the death of the victims could be inferred from the use and availability of the knife in stabbing them many times in a brutal manner; from their expressed motive of obtaining transportation; from a whispered dialogue between the defendants in the presence of the Witts; from the time-lapse of stabbing one victim to the time of stabbing the second victim which, of itself, would provide the necessary element of time for second thoughts and deliberation.

## ROBBERY

Turning then to the same factual outline above and the inferences flowing from them, and applying the same appellate and circumstantial evidence rules, we hold that the jury and trial court were justified in finding that the deaths occurred in the perpetration of a robbery as well as purposefully and with premeditated malice.

The applicable statute on aggravated robbery is § 6–66, W.S.1957, which reads as follows:

"Whoever forcibly and feloniously takes from the person or possession of another any property of value, by violence or by putting in fear, when a firearm or other deadly weapon is used or exhibited in the commission of the offense, is guilty of aggravated robbery and shall be imprisoned in the penitentiary for not less than five years nor more than fifty years."

The defendants arrived at the isolated Witt home at night wanting transportation; they falsely told the Witts that their car had broken down some distance from their

house; Witt prevailed on his neighbor, Davis, to join him while providing the defendants with a ride to Cheyenne; the defendants were arrested some 20 hours later in Chicago, nearly 1,000 miles from Cheyenne; they were in possession at that time and place of the Witt vehicle; a "pat-down" search of one of the defendants revealed a knife, the size of which was more than capable of inflicting lethal wounds; Witt and Davis were subsequently found dead 2½ miles from the Witt home; they had both suffered multiple fatal stabs with a knife like the one taken from the defendant; some of the wounds were inflicted in the backs of the victims; no bruises or abrasions were found on the defendants except one cut finger; blood of the victims' types was found in several places, including the pick-up and victims' clothing; some of the equipment from the truck and some of the victims' clothing were discovered along the highway toward Chicago and in the truck.

Those facts, and the reasonable inferences drawn from them, justified the jury in finding intent to take property of value from the possession of the victims by force and violence while using a deadly weapon, i. e. robbery.

To add substance and clarity in considering the jury's justification, an examination of our previous holdings and those of other jurisdictions is helpful.

The word "feloniously" as used in our robbery statute, quoted above, was discussed in dissent by Chief Justice Potter in *McGinnis v. State,* 16 Wyo. 72, 97 et seq., 91 P. 936, 945 (1907), in part as follows:

"Let us now examine the meaning and effect, as determined by judicial authority, of the word 'felonious.' While that is a technical word, it has always been held to imply a criminal intent, and, as descriptive of the act charged, that it was done with intent to commit a crime, or, as said in a Montana case: 'It means that the act was done with the mind bent on that which is wrong, or with a guilty mind.' *State v. Rechnitz,* 20 Mont. 488, 52 P. 264. * * * "

" * * * the word 'feloniously' as used in our statute defining robbery, was intended, as at common law, to supply the element of criminal intent, and to exclude the idea that the defendant took his own property, * * * ." 91 P. at 946.

In *People v. Butler,* 65 Cal.2d 569, 55 Cal.Rptr. 511, 421 P.2d 703 (1967), defendant was charged with murder and assault with intent to murder. He was convicted of first degree felony-murder and assault with a deadly weapon.

The court held felonious taking of personal property of another and against his will by force or fear is robbery. "An essential element of robbery is the felonious intent or *animus furandi* that accompanies the taking." Since robbery is but larceny aggravated by use of force or fear to accomplish the taking of property, then felonious intent required to rob is the same intent common to those offenses that, like larceny, are grouped as theft in penal code.

*Johnson v. State,* 562 P.2d 1294, 1298 (Wyo.1977), says:

"It is also appropriate to note that a weapon identified as similar to or bearing a sufficient resemblance to the one used by the defendant in the commission of the criminal act [aggravated robbery] is admissible in evidence, [citations omitted]. This evidence is relevant to show availability to the defendant of the means to commit the crime in conformity with the charges filed against him. * * * "
*Davidson v. State,* Okl.Cr., 550 P.2d 974, 977 (1976); *Stalley v. State,* 91 Nev. 671, 541 P.2d 658, 661 (1975); 22A C.J.S. Criminal Law § 712, p. 956. See *Daellenbach v. State,* 562 P.2d 679, 682 (Wyo.1977).

## FELONY-MURDER

In *Richmond v. State,* 554 P.2d 1217 at 1232 (Wyo.1976):

" * * * Felony-murder is an unusual offense in that the death arising out of the robbery is purely an incident of the basic offense. It makes no difference whether or not there was an intent to kill. The statutory law implies all of the

malevolence found and necessary in the crime of first-degree murder alone. * * * "

Many cases have construed the statutory words "in the perpetration of" a named felony as found in § 6–54(a) W.S.1957, quoted at the beginning of this opinion. Does the phrase mean that the homicide must precede, follow or be contemporaneous with the robbery, in this case?

Most of the states have adopted the logical answer that the time sequence is not important as long as the evidence, including the inferences, point to one continuous transaction.

One of the leading cases evoking that principle is *Commonwealth v. Stelma,* 327 Pa. 317, 192 A. 906, 908 (1937), which says in part:

"First, it is the contention of defendant that there is not sufficient evidence to support a verdict of first degree murder. The Commonwealth having established by the verdict that the homicide was committed in the perpetration of a robbery, it is deemed to be murder in the first degree, as the statute expressly provides: 'All murder * * * which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be deemed murder in the first degree.' [citations omitted] The defendant's argument that the intention to rob originated subsequent to the assault upon the deceased need not be seriously considered in view of the verdict of the jury. Moreover, even though such were the case, it is immaterial when the design to rob was conceived, if the homicide occurred while defendant was perpetrating or attempting to perpetrate a robbery. Where the killing occurs in the perpetration of any of the crimes specifically named in the statute referred to, the intent to kill is immaterial. * * * "

*Stelma* has been followed in *Commonwealth v. Slavik,* 437 Pa. 354, 261 A.2d 583 (1970), in which the court said in effect that if a homicide occurs in the perpetration of a robbery, a conviction of first degree murder

will be sustained "regardless of when the design to rob was conceived." In *Commonwealth v. Hart,* 403 Pa. 652, 170 A.2d 850, 853 (1961), cert. den., 368 U.S. 881, 82 S.Ct. 130, 7 L.Ed.2d 81, the court said:

" * * * defendant would require a televised stop-watch in every robbery or felony-killing to prove that the felonious intent existed before the attack. It is rare, we repeat, that a criminal telephones or telegraphs his criminal intent and consequently such intent can be properly found by the jury from the facts and circumstances in a particular case. * * * " See also *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391, 413 (1975), cert. den., 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).

A California case says:

" * * * We have concluded, however, that the fact that the victim was dead does not render inapplicable the felony-murder doctrine when, as here, the blows causing the death and the maiming took place as part of one continuous transaction." *People v. Jentry,* 69 Cal.App.3d 615, 138 Cal.Rptr. 250, 258 (1977).

*Jentry* was preceded by many felony-murder cases in California. One of the leading cases is *People v. Chavez,* 37 Cal.2d 656, 234 P.2d 632 (1951), where it announced the following principle at p. 640:

" * * * The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute [felony murder] was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistance of the felony before the homicide was completed."

*People v. Mason,* 54 Cal.2d 164, 4 Cal. Rptr. 841, 351 P.2d 1025 (1960), followed *Chavez.* In *Mason* the murder occurred 20 hours after the burglary. 4 Cal.Rptr. at page 843, 351 P.2d 1027, at page 1028, Justice Traynor said:

" \* \* \* if the jury found that defendant committed burglary by entering the house with intent to commit a felonious assault, the homicide and the burglary were parts of one continuous transaction. \* \* \* "

Other California cases to the same end are: *People v. Medina*, 41 Cal.App.3d 438, 116 Cal.Rptr. 133, 142 (1974); *People v. Sirignano*, 42 Cal.App.3d 794, 117 Cal.Rptr. 131 (1974); *People v. Keith*, 52 Cal.App.3d 947, 125 Cal.Rptr. 676 (1975); *People v. Tolbert*, 70 Cal.2d 790, 76 Cal.Rptr. 445, 452 P.2d 661, 666 (1969).

Some other jurisdictions having the same views as those above are: *State v. Whitfield*, 129 Wash. 134, 224 P. 559 (1924); *State v. Anderson*, 10 Wash.2d 167, 116 P.2d 346 (1941); *State v. Craig*, 82 Wash.2d 777, 514 P.2d 151, 155 (1973), where it is said: "Nor does the fact that the homicide occurred before the robbery was consummated change the character of the latter offense."

*Parson v. State*, 222 A.2d 326, 332 (Del. 1966), cert. den., 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807; *State v. Connor*, 241 N.W.2d 447, 460, 464 (Iowa 1976), says: "A murder which occurs as part of an unbroken chain of events to aid escape or to conceal guilt of the felony is committed in perpetration of the felony."

*State v. Owen*, 73 Idaho 394, 253 P.2d 203, 213 (1953); *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487, 492 (1974), quoting *People v. Welch*, 8 Cal.3d 106, 104 Cal.Rptr. 217, 501 P.2d 225 (1972) and *Commonwealth v. Banks*, 454 Pa. 401, 311 A.2d 576, 578 (1973).

*State v. Miller*, 110 Ariz. 489, 520 P.2d 1113, 1114 (1974), quotes *People v. Mason*, *supra.* *State v. Phillips*, 299 S.W.2d 431, 434 (Mo.1957).

*State v. Reid*, 146 Conn. 227, 149 A.2d 698 (1959); *Commonwealth v. Tarver*, 345 N.E.2d 671, 679 (Mass.1975).

*Grigsby v. State*, 542 S.W.2d 275, 281 (Ark.1976), which cites *Conrad v. State*, 75 Ohio St. 52, 78 N.E. 957 (1906), and says: " \* \* \* The sequence of events is unimportant and the killing may precede, coincide with or follow the robbery and still be committed in its perpetration."

*Bizup v. People*, 150 Colo. 214, 371 P.2d 786 (1962), cert. den., 371 U.S. 873, 83 S.Ct. 144, 9 L.Ed.2d 112 and followed on habeas corpus in 316 F.2d 284.

*State v. Montgomery*, 191 Neb. 470, 215 N.W.2d 881, 883 (1974), states:

"No specific intention is required to constitute \* \* \* the felony in question. \* \* \* There is no requirement in the statute that the intent to rob be formed at any particular time as long as the killing occurs as the result of acts committed while in the perpetration of the robbery."

*Montgomery* is discussed in *State v. McDonald*, 195 Neb. 625, 240 N.W.2d 8, 14 (1976).

*State v. Nelson*, 65 N.M. 403, 338 P.2d 301, cert. den., 361 U.S. 877, 80 S.Ct. 142, 4 L.Ed.2d 115 (1959), where the defendant contended the robbery was an afterthought, the court said if the killing is committed within the res gestae of the felony, whether the homicide occurred before or after the felony is not determinative of defendant's liability for felony murder.

For an annotation: "What constitutes termination of a felony for purpose of felony-murder rule" see 58 A.L.R.3rd 851. One topic covered therein is summarized as follows at page 857:

" \* \* \* The vast majority of cases within the scope of this annotation unarguably support the view that escape is ordinarily within the res gestae of the felony and that a killing committed during escape or flight is ordinarily felony-murder."

Judge Holtzoff in *United States v. Naples*, 192 F.Supp. 23, 33 (1961), rev'd. on other grounds, 113 U.S.App.D.C. 281, 307 F.2d 618 (1962), said:

" \* \* \* The overwhelming weight of authority is to the effect that if the homicide is committed within what is referred to as the *res gestae* of the burglary or housebreaking, that is, in connection with it, the killing constitutes felony murder.

It suffices if the burglary and the homicide are parts of one continuous series of acts connected with each other. This doctrine applies if the burglary or housebreaking had been technically completed and the criminal is gathering his plunder and is preparing to make his departure when he kills his victim. The principle is extended to a situation where the defendant has left the premises, is endeavoring to make his escape, and kills someone while being pursued."

In summary, as supplemented by Instruction 12, the disjunctive verdict rendered in this case, to-wit that defendants were guilty of killing Messrs. Witt and Davis purposefully and with premeditated malice *or* in the commission of, or in an attempt to commit, a robbery, causes no ambiguity or uncertainty when the facts, circumstances and legitimate inference substantially support all of the essential elements of both offenses. The district court was not in error in overruling defendants' motions. The remaining assignments of error are found to lack merit sufficient to find reversible error.

The case is remanded to the district court to resentence the defendants under § 6–54(e), W.S.1957, 1975 Cum.Supp., in conformity with this opinion.